In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2643

United States of America,

Plaintiff-Appellee,

v.

Anselmo Carrillo and Francisco Soto,

Defendants-Appellants.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 CR 54--Charles R. Norgle, Sr., Judge.

Argued May 9, 2001--Decided October 18, 2001

   Before Ripple, Manion, and Kanne, Circuit
Judges.

   Kanne, Circuit Judge.  After an
investigation by the Drug Enforcement
Administration, ("DEA"), Anselmo Carrillo
and Francisco Soto were arrested and
charged with possession with intent to
distribute cocaine and conspiracy with
intent to distribute cocaine. The jury
found them both guilty as charged, and
each was sentenced to 151 months
imprisonment. On appeal, they present
several challenges to their respective
convictions and sentences. Because we
find no errors requiring reversal, we
affirm the judgment of the district
court.

I.  History

   In August 1998, Ross Braatsch, the owner
of the Chicago-area electronics store
Sound Wave Ltd., agreed to provide
confidential information to DEA Agent
Robert Glynn about several of his
customers that he suspected of being
involved with drug trafficking. Sound
Wave offered a service installing vehicle
"traps" (hidden compartments in cars that
can only be opened by remote control),
and Braatsch believed that certain
individuals were using the traps to
transport illegal drugs. Braatsch
informed Agent Glynn that one of his

customers, Tavo Perez, had paid approximately $50,000 in cash over a twenty-one month period to have traps and other electronic equipment installed in twelve different cars. He also informed Agent Glynn that several different men had picked up Perez's cars and that he had shown two of these men, later identified as Carrillo and Soto, how to operate the traps.

In December 1998, Perez brought two of his trap cars--a red Mercury Sable and a white Ford Taurus--to Sound Wave for repairs. On both of these occasions, Perez was accompanied by a man driving a red Toyota Tacoma pick-up truck. While the traps were being repaired, Agent Glynn confirmed that the cars did have traps and recorded the license plate numbers of the vehicles. Agent Glynn began conducting surveillance of Perez's residence, and on December 30, 1998, he observed Perez drive the Tacoma pick-up truck from his residence to Sound Wave, where he picked up the white Taurus. Agent Glynn then followed Perez to a single-family residence with an attached garage at 109 Clarendon Street in Addison, Illinois. Perez pulled the Taurus into the garage, and Agent Glynn observed that the red Sable was also in the garage. Between December 30, 1998 and January 27, 1999, Agent Glynn continued to conduct surveillance of Perez; he also set up video surveillance of the red Sable.

On January 27, 1999, DEA agents used a tracking device to track the red Sable to Number 20, West 327 Belmont Place, in Addison. Several agents set up organized surveillance of that location as well as the residence at 109 Clarendon. At 3:45 p.m., three males arrived at West 327Belmont Place in the red Tacoma. One of these men, later identified as Carrillo, exited the truck and got into the red Sable. Agents then followed both vehicles to 109 Clarendon, where they observed the white Taurus in the garage. Initially, the red Sable was parked in the driveway and the red Tacoma was parked on the street. After a short time, agents observed that the garage door was closed and that the Sable was no longer in the driveway. At that point, Agent Paul Wolf got out of his car and approached the residence. Although he did not see any of the three men inside the

house, he heard male voices in the garage. At approximately 6:00 p.m., two hours after the vehicles had arrived at 109 Clarendon, Agent Glynn observed Soto and another Hispanic male exit the garage and get into the red Tacoma pick-up truck. At the same time, Officer Luis Dominguez, a DEA task force officer, observed Carrillo drive the red Sable away from 109 Clarendon.

Agent Glynn attempted to follow the red Tacoma, but he lost track of it after the driver performed several evasive maneuvers. At 6:20 p.m., he located the red Tacoma in a movie theater parking lot, and there were now three individuals in the truck. Agent Glynn observed that the red Sable was parked in the movie theater lot. Agent Wolf then began following the red Tacoma. The driver performed a series of turns indicative of counter-surveillance activities and eventually headed back towards the movie theater parking lot. At that point, the agents stopped the truck. At the time of the stop, Soto was driving, Carrillo was in the passenger seat, and the third occupant was in the extended portion of the truck. Carrillo had the following items in his possession at the time of the arrest: a garage door opener for 109 Clarendon, a house key for the basement of 109 Clarendon, and a computer chip that operated the trap in the red Sable. The agents arrested the three men and transported them to the Addison Police Department.

Several other agents continued surveillance of the red Sable. At approximately 7:00 p.m., they observed a blue Jeep Cherokee driving up and down the parking lot of the movie theater past the Sable. Agents stopped the Jeep Cherokee and recovered keys for the Sable as well as a computer chip that operated the Sable's trap from one of the occupants. The Sable was then transported to the Addison Police Department.

At the Addison Police Department, Agent Wolf conducted a preliminary interview of Soto and Carrillo during which both men identified themselves using aliases. Officer Dominguez, who is fluent in Spanish, then questioned the two men separately. During the interviews, Carrillo and Soto both changed their stories a number of times when confronted

with the agents' knowledge of their activities. Neither provided an explanation for the activities leading up to the arrest. At the end of his interview, Soto consented to a search of the red Sable. Agents searched the vehicle and recovered 48 one-kilogram bricks of cocaine from the Sable's trap.

Agents also obtained consent to search 109 Clarendon and 20 West 327 Belmont. At 109 Clarendon, agents observed that the white Taurus was in the garage and found an empty box containing a rubber glove. At West 327 Belmont, the agents found an empty trap compartment built into the basement floor. A few days later, in response to a tip from a confidential source, several DEA agents returned to 109 Clarendon and found a crawl space containing material used to wrap bricks of cocaine as well as a box of rubber gloves. Agents also found a trap in the basement floor that  contained two kilograms of cocaine, a scale, a semi-automatic handgun, ammunition, and drug ledgers.

Carrillo and Soto were indicted for possession with intent to distribute cocaine, and conspiracy with intent to distribute cocaine in violation of 21 U.S.C. sec. 841(a)(1) and sec. 846. At trial, the government presented testimony of the DEA agents involved in the investigation as well as evidence of pager and cell phone communications between Carrillo and Soto. Neither defendant testified at trial, though Soto called one witness who attempted to cast doubt on the government's assertion that he was driving evasively on the night of his arrest. Carrillo called no witnesses. The jury found both defendants guilty. On June 21, Carrillo and Soto were each sentenced to 151 months imprisonment and five years supervised release.

On appeal, Carrillo and Soto ask us to overturn their convictions and sentences because: (1) government agents lacked probable cause at the time of their arrests; (2) the district court violated Rule 30 of the Federal Rules of Criminal Procedure by waiting until after closing arguments to hold a jury instructions conference and finalize the jury instructions; (3) the district court's decision to give an "ostrich" instruction was erroneous; (4) they are entitled to a

minor role adjustment; and (5) the district court should have suppressed their post-arrest statements because the arresting officers failed to inform them of their right to communicate with the Mexican consulate. We will address each of these claims in turn.

## II. Analysis

### A. Probable Cause

Prior to trial, Soto and Carrillo each filed a motion to quash arrest and suppress their post-arrest statements, arguing that the DEA agents did not have probable cause for their arrest. The district court determined that an evidentiary hearing was not warranted and denied defendants' motions. Both defendants renewed their motions at the close of evidence at trial, and the district judge again denied the motions. On appeal, Carrillo and Soto concede that the circumstances surrounding their arrest were suspicious enough to justify a Terry stop. See Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). They claim, however, that the level of suspicion did not rise to the level of probable cause because the agents did not have specific information about Carrillo and Soto or about a drug transaction that was supposed to occur that night. They also point out that the agents never saw either defendant in possession of contraband. Because the defendants do not challenge the district court's factual findings, we review de novo the district court's determination that probable cause did exist. See United States v. Faison, 195 F.3d 890, 893 (7th Cir. 1999).

Probable cause exists if "law enforcement agents . . . reasonably believe, in light of the facts and circumstances within their knowledge at the time of the arrest, that the suspect had committed or was committing an offense." United States v. Hayes, 236 F.3d 891, 894 (7th Cir. 2001). This determination is necessarily based on probabilities, see Faison, 195 F.3d at 893, and does not require "evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." United States v. Mounts, 248 F.3d 712, 715 (7th Cir. 2001)

(quotation omitted). In determining whether suspicious circumstances rise to the level of probable cause, law enforcement officers are entitled to draw reasonable inferences based on their own training and experience. See Faison, 195 F.3d at 893. Of course, the "existence of probable cause turns on the information known to the officers at the moment the arrest [was] made, not on subsequently-received information." Spiegel v. Cortese, 196 F.3d 717, 723 (7th Cir. 2000).

Although the agents did not have specific information about the defendants or observe them handling any substances believed to be narcotics, we believe that the totality of the suspicious circumstances at the time of the arrest justified a finding of probable cause. See United States v. Scott, 19 F.3d 1238, 1242 (7th Cir. 1994) (stating that the validity of a warrantless arrest is based on the "totality of the circumstances"). Prior to Carrillo and Soto's arrests, DEA agents had received information from the confidential source, Braatsch, that Perez had paid cash to have traps installed in twelve different cars, and had substantiated this information by confirming that there were, in fact, traps in two of Perez's cars. After conducting surveillance, agents linked Carrillo and Soto to trap vehicles owned by Perez, as well as to Perez's red Tacoma pick-up truck. Although we agree with the defendants that the existence of a vehicle trap in itself is not enough to establish probable case--traps may, of course, be used for legitimate purposes--the existence of a trap coupled with other suspicious circumstances does create a level of suspicion sufficient to support a finding of probable cause. Cf. United States v. Arango, 912 F.2d 441, 447 (10th Cir. 1990) (finding that inadequate luggage for the stated length of trip coupled with the appearance of a hidden compartment under truck bed supported a finding of probable cause).

Here, agents had several other reasons to be suspicious of the defendants' behavior. During their surveillance, agents observed that the trap cars were not being driven in a manner consistent with normal personal or business use; nor did they see any evidence that the traps were being used in any legitimate

manner./1 On the night of defendants' arrest, agents knew that the red Sable had been parked in a garage for several hours with another known trap vehicle, and then driven to a parking lot and left there. Based on his experience in more than 100 narcotics investigations involving trap vehicles, Agent Glynn believed that the defendants' activities with respect to the trap vehicle were consistent with a pattern of drug trafficking. Furthermore, agents twice observed that the red Tacoma was being driven circuitously in an apparent attempt to evade surveillance, and our cases have held that this is a proper consideration in determining whether probable cause exists. See United States v. Colonia, 870 F.2d 1319, 1323 (7th Cir. 1989); United States v. Marin, 761 F.2d 426, 432 (7th Cir. 1985). Therefore, we find that the totality of the circumstances, when considered in light of the DEA agents' training and experience, gave the agents sufficient reason to believe that there was a significant probability that a crime was being committed. Thus, we uphold the district court's determination that probable cause existed to arrest Carrillo and Soto.

## B. Rule 30 Conference

Defendants next claim that the district court erred by waiting until after closing arguments to finalize the jury instructions in violation of Rule 30 of the Federal Rules of Criminal Procedure. The day before the final day of trial, defense counsel indicated to the district court that the parties were going to attempt to agree on jury instructions. In response, the district court told counsel, "[i]f there are any issues, give me the disputed instructions so I have a couple of minutes to look them over." On the following day after the close of evidence, the district court asked the attorneys if they were ready for closing arguments, and the government raised the fact that the jury instructions had not yet been finalized. The court held a sidebar in which the following exchange occurred:

The Court: Well, I think that you could still make your closing arguments. I have looked them over basically and they appear to be proper. But I am still open-

minded, in the event that defense counsel want to challenge any specific instruction. But I think, based upon what you have given here, you certainly could make your closing argument consistent with these instructions.

. . .

The Court: Well, what we could do is let the government make its closing argument, and then send the jurors to lunch, and then defense counsel would have the lunch hour to further prepare for their closing arguments.

[Government]: That's good.

The Court: So--

[Carrillo's counsel]: That's good, your honor.

The Court: So I will tell the jury that, that after [the prosecutor] goes we will stop for lunch. And during that lunch hour, if there is any problem with the instructions, we will go over the instructions.

Trial Tr. at 635-36. At that point, the government presented its closing argument and the court recessed for lunch. There is no evidence that either defendant took the district court's suggestion to raise any issues with the jury instructions during the lunch hour. After court reconvened, both defendants made their closing arguments, and the government made its rebuttal argument. At that point, the court held a sidebar during which the government voluntarily withdrew one of the instructions and the defendants objected unsuccessfully to five other instructions. The defendants did not, however, object to the procedure by which the district court formulated the jury instructions.

The Federal Rules of Criminal Procedure provide that "[t]he court shall inform counsel of its proposed action upon the [tendered jury instructions] prior to their arguments to their jury." Fed. R. Crim. P. 30. However, neither defendant objected to (and one defendant affirmatively accepted) the district judge's proposed plan to let the government proceed with its closing argument and discuss any issues with the

jury instructions at the lunch hour. Nor did Carrillo or Soto raise any objection to the district court's procedure--or to any specific proposed instruction--during the lunch hour or prior to defendants' closing argument. Because neither of the defendants objected to the timing of the jury instruction conference at any point prior to the close of trial, we will review only for plain error. See United States v. Olano, 507 U.S. 725, 733-34, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993). "Under the plain error doctrine, we have the discretion to reverse only where the trial court's error is clear, prejudicial, and affect[s] substantial rights." United States v. Benitez, 92 F.3d 528, 533 (7th Cir. 1996).

There is no question that the jury instructions should have been finalized before closing arguments. However, although a technical violation of Rule 30 did occur, it is clear that the error did not violate the defendants' substantial rights. The district court gave the defendants ample opportunity to object to the proposed instructions. Moreover, this is not a case in which defense counsel were forced to present their closing arguments with no idea what the jury instructions were going to be. Nor did the district judge indicate that he would not give a specific instruction and then give it, cf. United States v. Ienco, 92 F.3d 564, 569 (7th Cir. 1996) (finding that defendant was prejudiced where trial court gave Pinkerton instruction after advising counsel that he would not), or refuse to give an instruction that he had tentatively agreed to give. Instead, the district judge provisionally approved the tendered instructions and then gave all of those instructions except for one which was withdrawn by the government. Therefore, we reject defendants' contention that the timing of the Rule 30 conference "affect[ed] the fairness, integrity, or public reputation of the judicial proceedings." Olano, 507 U.S. at 736.

C.  "Ostrich" Instruction

Defendants next assert that the district court erred by giving an "ostrich" or "conscious avoidance" instruction over their objection./2 The purpose of a conscious avoidance instruction is to explain to the jury that the legal

definition of "knowledge" includes the deliberate avoidance of knowledge. See United States v. Craig, 178 F.3d 891, 896 (7th Cir. 1999). Caution must be exercised when giving the instruction, however, because of "its tendency to allow juries to convict upon a finding of negligence for crimes that require intent." United States v. Giovannetti, 919 F.2d 1223, 1228 (7th Cir. 1990). Thus, our cases hold that the instruction is only proper "when a defendant claims a lack of guilty knowledge and there are facts and evidence that support an inference of deliberate ignorance." United States v. Walker, 25 F.3d 540, 546 (7th Cir. 1994) (quotation omitted).

Carrillo and Soto claim that the district court erred in giving the ostrich instruction because the government did not present sufficient evidence that they deliberately avoided learning that the trap cars were being used to transport cocaine. Thus, they contend that the jury was presented with an improper "binary" choice between "actual knowledge and complete innocence." United States v. Graffia, 120 F.3d 706, 713 (7th Cir. 1997). We disagree. Viewing the evidence in the light most favorable to the government, as we must, see United States v. Wilson, 134 F.3d 855, 868 (7th Cir. 1998), we conclude that the government presented sufficient evidence to support such an inference.

The government is not precluded from presenting evidence of both an actual knowledge theory and a conscious avoidance theory. See Wilson, 134 F.3d at 868. Here, the government did just that, and presented substantial evidence of actual knowledge as well as circumstantial evidence sufficient to raise an inference that, if the defendants did not know that the trap cars were being used to transport narcotics, then they must have deliberately avoided obtaining that knowledge. The government presented evidence that Carrillo and Soto had both accompanied Perez to Sound Wave in order to pick up trap cars, that Braatsch had shown Carrillo and Soto how to operate the traps, that the defendants lied to the police about their activities on the day of the arrest, and that Carrillo had keys to the red Sable as well as to the

remote control that opened the trap. Moreover, it is unlikely that the jury could have convicted the defendants based only on negligence in light of the district court's instructions that "[a] defendant's presence at the scene of a crime and knowledge that a crime is being committed is not alone sufficient to establish the defendant's guilt" and "[a] defendant's association with conspirators or persons involved in a criminal enterprise is not sufficient to prove his participation or membership in a conspiracy." See United States v. Paiz, 905 F.2d 1014 (7th Cir. 1990) (abrogated on other grounds by Gozlon-Peretz v. United States, 498 U.S. 395, 111 S. Ct. 840, 112 L. Ed. 2d 919 (1991)) (holding that the issuance of an ostrich instruction was harmless error because its effect was "neutralized" by the court's "mere presence" and "willing participation" instructions which "tended to negate any chance that the jury would convict [the defendant] on any finding other than that he knowingly joined and participated in the conspiracy.") (citation omitted)./3

D.  Minor Role Adjustment

   As indicated above, Soto and Carrillo were each sentenced to 151 months imprisonment. Prior to sentencing, Soto filed a written objection to the Pre-Sentence Investigation Report ("PSR"), arguing that he deserved a two-point reduction for playing a minor role in the offense. See U.S. Sentencing Guidelines Manual sec. 3B1.2. Carrillo did not file any written objections to the PSR, and when questioned at the sentencing hearing, his attorney stated that he did not wish to move for a reduction pursuant to section 3B1.2 of the Guidelines./4 Both defendants now ask us to reconsider the district judge's decision not to apply a minor role adjustment. Carrillo, however, has waived this issue by failing to object to the PSR in writing, and by indicating to the district court that he had no objections. See United States v. Staples, 202 F.3d 992, 995 (7th Cir. 2000). Therefore, appellate review is precluded. See id. ("Waiver extinguishes the error and precludes appellate review.")

   With respect to Soto's claim, we review the district court's findings of fact for clear error, and the court's legal

conclusions de novo. See United States v. Mojica, 185 F.3d 780, 790-91 (7th Cir. 1999). It is well-settled in our circuit that a defendant's eligibility for the reduction depends on "whether the defendant was a minor participant in the crime for which he was convicted, not whether he was a minor participant in some broader conspiracy that may have surrounded it." United States v. Isienyi, 207 F.3d 390, 392 (7th Cir. 2000). Thus, a drug courier who is only held accountable for the amount of drugs he carried is not entitled to the reduction. See United States v. Burnett, 66 F.3d 137, 140 (7th Cir. 1995). We have recognized that a circuit split exists on this issue, see United States v. Hamzat, 217 F.3d 494, 497 (7th Cir. 2000), however, and a proposed amendment to the Commentary to section 3B1.2 of the Guidelines adopts the position that a minor role reduction is warranted even if the offense level "is determined solely by the quantity personally handled by the defendant." See U.S. Sentencing Commission, Proposed Amend. 7, 65 FR 66792, 66798 (Nov. 7, 2000).

Soto argues that, in light of the proposed amendment to section 3B1.2, we should remand to the district court for re-sentencing. We decline to do so not only because the amendment has not yet been adopted but because we are not convinced that Soto would be entitled to the reduction even under the proposed amendment. At sentencing, the government presented sufficient evidence to show that Soto's role went well beyond the role of "mere courier." There was substantial circumstantial evidence to suggest that Soto's role in the conspiracy was an important one, even when viewed in the context of the entire conspiracy--he had been shown how to operate the traps, had been present in the garage where the cocaine was presumably loaded into the Sable's trap, conducted counter-surveillance, and picked up Carrillo at the movie theater after Carrillo dropped off the Sable containing the cocaine. Therefore, the district court's finding that Soto was not entitled to a minor role adjustment was not erroneous.

E.  Vienna Convention

Lastly, defendants, who are Mexican

nationals, contend that the district court should have suppressed their post-arrest statements because the arresting officers did not comply with Article 36(1)(b) of the Vienna Convention on Consular Relations. Article 36(b)(1) requires authorities to inform a foreign national who is arrested or detained of his right to communicate with his home consulate. Although defendants recognize that this argument is foreclosed by our recent decisions in United States v. Lawal, 231 F.3d 1045, 1048 (7th Cir. 2000), cert. denied, ___ U.S. ___, 121 S. Ct. 1165, 148 L. Ed. 2d 1024 (2001) (finding that the exclusionary rule is not a proper remedy for a violation of a detainee's Article 36 rights), and United States v. Chaparro-Alcantara, 226 F.3d 616, 624-25 (7th Cir.), cert. denied, 531 U.S. 1026, 121 S. Ct. 599, 148 L. Ed. 2d 513 (2000) (same), they ask us to reconsider those decisions. We decline to do so; accordingly, we find that the district court did not err by admitting defendants' post-arrest statements.

## III.  Conclusion

For the reasons stated above, we AFFIRM the judgment of the district court.

FOOTNOTES

/1 According to Braatsch, one legitimate use of a trap would be to accommodate stereo amplifiers. In this case, Agent Glynn observed that the secret compartments were hidden inside the stereo equipment rather than vice versa.

/2 The district court instructed the jury:

When the word "knowingly" is used in these instructions, it means that the defendant realized what he was doing and was aware of the nature of his conduct and did not act through ignorance, mistake, or accident. Knowledge may be proved by the defendant's conduct and by all the facts and circumstances surrounding the case.

You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his eyes for fear of what he would learn, you may conclude that he acted knowingly as I have used that word.

You may not conclude that the defendant had knowledge if he was merely negligent in not discovering the truth.

/3 In any event, any error was harmless in light of the substantial evidence that the defendants had actual knowledge of the illegal activities. See Graffia, 120 F.3d at 713 n.5.

/4 At the sentencing hearing, Carrillo's counsel informed the court, "[w]ell, your honor, Mr. Carrillo has been adequately informed about the presentence report. He has read it with the assistance of others in the [prison]. He assured me he understands it. He has no request concerning the minor participant. He is leaving that matter entirely up to you." Tr. at 22-23.