In the

# United States Court of Appeals
## For the Seventh Circuit

No. 02-2999

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

LORENZO FUNCHES, JUAN CARLOS TORO,
and CARLOS DeJESUS MUNOZ,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 CR 8—**Milton I. Shadur**, *Judge.*

ARGUED JANUARY 21, 2003—DECIDED APRIL 29, 2003

Before POSNER, KANNE, and DIANE P. WOOD, *Circuit Judges.*

KANNE, *Circuit Judge.* The three defendants, Lorenzo Funches, Juan Carlos Toro, and Carlos DeJesus Munoz, were indicted on various narcotics and firearms charges. The indictments arose from a warrantless arrest that followed a surveillance in which Drug Enforcement Administration ("DEA") agents observed an exchange of plastic bags in an alley. A search incident to the arrest uncovered substantial amounts of drugs and cash. Defendants moved to suppress the evidence, claiming that the DEA agents lacked probable cause to arrest them and that all evidence recovered was therefore fruit of the unlawful

arrest. The district court granted the motions and suppressed the evidence. The government appeals, and we reverse.

## I. History

### A. The Arrest

In August 2001, the DEA received information that a Columbian drug dealer recently moved into an apartment in a large three-story, multi-unit apartment building at 7412 North Western Avenue in Chicago, Illinois. Agents had conducted periodic surveillance of the area for several months pursuant to the tip but had not located the suspect.

On January 2, 2002, five agents each in separate cars set up surveillance of the apartment building. At 12:30 p.m., Juan Toro, driving an Infiniti automobile, parked in the back of the building, got out of the car, and went in. Around 1:00 p.m., Toro and Carlos Munoz left the building together and got into the Infiniti. The agents knew that neither Toro nor Munoz was the man for whom they were looking and had no information that Toro or Munoz were involved in drug trafficking, but they decided to follow the car. Over the next hour and a half, Toro and Munoz made stops at locations in Evanston and Lincolnwood, which appeared legitimate.

Then, at approximately 2:30 p.m., back in Chicago, Toro and Munoz pulled into a Dominick's grocery store parking lot on Sheridan Road. The agents looked on as Toro got out of the Infiniti, walked to a Nissan Altima parked nearby, and entered the Altima on the passenger side. Lorenzo Funches was sitting in the driver's seat of the Altima. Funches and Toro talked in the Altima for roughly one-half hour. At around 3:00 p.m., Munoz, who had moved from the passenger side to the driver side, pulled

the Infiniti out of the parking lot, and Funches and Toro followed in the Altima. The agents followed the two cars, which were driven to an alley about ten minutes from the Dominick's grocery store. Munoz entered the alley first in the Infiniti. Funches followed and parked the Altima about halfway through the alley. Munoz continued through the alley and drove off, leaving Funches and Toro behind in the Altima. Agent McCoy, the DEA team leader, parked in the alley a few car lengths behind the Altima. Other agents parked nearby, and one agent followed Munoz.

Munoz drove to an apartment building at 5730 North Sheridan, less than a minute from the alley he just left. He parked in front of the building and made a call from his cell phone. A few minutes later, a woman came out of the apartment building carrying a gray shopping bag, which she handed to Munoz through the Infiniti's passenger-side window.

Munoz then drove back to the alley, passed Agent McCoy, and parked behind the Altima. Toro got out of the Altima, carrying a gold shopping bag and walked back to the Infiniti. Toro handed the gold bag to Munoz through the passenger-side window. Toro then received the gray shopping bag from Munoz and returned to the Altima. Toro handed the gray bag to Funches through the passenger-side window. Toro then walked back to the Infiniti and entered the car on the passenger's side.

When the Infiniti and Altima began to pull forward, Agent McCoy, believing she had just witnessed a drug transaction, ordered the agents by radio to move in on Funches, Munoz, and Toro. Agent Hatch blocked the alley's exit with his car, got out with weapon drawn, and shouted "Police." He approached the driver's side of the Altima, and ordered Funches out of the car. Agent McCoy pulled up behind the Infiniti. She got of her car, weapon drawn,

ran past the Infiniti to the passenger's side of the Altima. As she was doing this, Agent Oberling left his car and approached the driver's side of the Infiniti, weapon drawn.

As Agent McCoy approached the Altima, she noticed a gray plastic bag on the passenger seat.[1] She called out to the other agents that there were drugs in the car. At this point, all three defendants were placed in handcuffs and put on the ground.

Both cars were searched. The gold plastic bag seized from the front seat of the Infiniti contained $40,000 in cash, and the gray plastic bag seized from the Altima contained two windbreaker jackets, presumably for cover, and two one-kilogram bricks of cocaine. After the Altima was impounded, an inventory search was conducted, and agents found approximately 460 grams of crack cocaine and a nine-millimeter semiautomatic handgun in two hidden compartments in the car. Based on documents found in Funches's possession at the time of arrest, agents obtained a search warrant for two safe deposit boxes, which, when subsequently searched, were found to contain nearly $500,000 in cash.

---

[1] Agent McCoy testified at the suppression hearing that when she looked through the Altima's side window she saw a brick-shaped package sitting inside the plastic bag, on the top of the other contents. She testified that based on her experience and training she recognized the package as a kilogram brick of cocaine. Agent Oberling testified that he saw the rectangular package lying on the front seat leaning against the plastic bag. The DEA report on the arrest described Agent McCoy as having seen the package "on the passenger seat of the Altima." (Tr. 46.) Based on the discrepancies among these accounts, the district court discredited the testimony of all the agents as to whether there were *any* drugs in plain view on the front seat of the car.

**B. The Suppression Hearing**

The defendants moved to suppress all evidence obtained as a result of the arrest, arguing that the agents had no probable cause to arrest them. The government contended that the agents had probable cause to believe that they had witnessed a drug transaction. Alternatively, the government argued that even if probable cause was lacking, there was at least reasonable suspicion to justify an investigatory detention pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), and that the reasonable suspicion ripened into probable cause seconds later when Agent McCoy saw the brick-shaped package in the Altima. The government also contended that Funches lacked standing to challenge the search of the Infiniti, and similarly, Toro and Munoz lacked standing to contest the search of Funches's Altima.

The district court rejected the government's *Terry* stop theory, holding that the detention of the defendants could not have been a *Terry* stop because the district court found that when the Altima and Infiniti began to pull out of the alley, Agent McCoy ordered an arrest, not an investigatory detention.[2] Further, the district court held that even assuming the initial detention was only a *Terry* stop, the reasonable suspicion never ripened into probable cause because, given the court's factual findings, there were no drugs in plain view on the front seat of the Altima. The district court dismissed the government's

---

[2] At the suppression hearing, there was conflicting testimony among the agents as to whether Agent McCoy initially ordered an arrest or merely an investigatory stop. She testified that she said something like, "Let's go," "Let's stop them," or, "Let's move in." Two other agents testified that she said, "Move in." Nonetheless, Agent McCoy testified that her intent was to convey an order to arrest the defendants, and the district court credited this statement in finding that an arrest order had been given.

argument that there was probable cause to arrest the defendants at the time the cars were stopped with little discussion, stating only that in all the cases the government cited on this point, the officers had more incriminating information before arresting the suspects than the agents did in this situation. Finally, the district court rejected the standing arguments advanced by the government. Having rejected the government's arguments, the court ordered exclusion of all evidence obtained as a result of the arrest.

## II. Analysis

The government does not challenge the district court's factual findings; rather, it disputes the court's legal determination that probable cause did not exist when Agent McCoy gave the arrest order.[3] We review the district court's legal determination *de novo*. *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

The Fourth Amendment protects citizens against unreasonable arrests. *Herzog v. Village of Winnetka*, 309 F.3d 1041, 1043 (7th Cir. 2002). For a warrantless arrest to be reasonable, law enforcement agents must have probable cause, which exists if, given the facts and circumstances within their knowledge at the time of arrest, the agents reasonably believed that the suspect had committed or was committing a crime. *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *United States v. Gilbert*, 45 F.3d 1163, 1166 (7th Cir. 1995). Determinations of probable cause are naturally based on probabilities, and a finding of probable

---

[3] The government also challenges the court's determination that defendants had standing to challenge the search of each other's car. Since we find that there was probable cause to support the arrests, we need not address the standing issue.

cause "does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." *United States v. Carrillo*, 269 F.3d 761, 766 (7th Cir. 2001) (quotation omitted); *see also Gerstein v. Pugh*, 420 U.S. 103, 121 (1975) (stating that the probable-cause determination "does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands"). In making probable-cause determinations, law enforcement agents are entitled to draw reasonable inferences from the facts before them, based on their training and experience. *Carrillo*, 269 F.3d at 766.

Importantly, the agents involved in this arrest had extensive experience in narcotics enforcement. Agent McCoy, who ordered the arrest, had worked as a DEA Special Agent for ten years, and Officer Hatch, another officer participating in the arrest, had worked as a DEA task-force officer and a policeman for ten years. Such expertise is highly significant because, as one commentator has noted, officers assigned to "specialized areas of enforcement, become familiar with the methods of those engaged in particular types of criminal activity," giving them an ability to detect unlawful activity where laymen might not. 2 WAYNE R. LAFAVE, SEARCH AND SEIZURE §3.2(c), at 38 (3d ed. 1996); *see also Carrillo*, 269 F.3d at 767.

Trained narcotics officers observing the defendants' actions in this case could reasonably conclude based on their experience that they had witnessed a drug transaction. The agents observed a meeting in a grocery store parking lot, where Toro, apparently serving as an intermediary, got into Funches's Altima where the two conversed for approximately half an hour while Munoz waited in the Infiniti. Instead of conducting the transaction in the open parking lot, Munoz led the Altima from the parking lot

to an alley about ten minutes away. Experienced agents would recognize the use of an intermediary and the parties moving to a less-visible location before goods are exchanged as common characteristics of drug transactions undertaken to protect the identity of sellers and to avoid detection by authorities. More importantly though, immediately upon reaching the alley, Munoz left Funches and Toro behind and drove to an apartment less than a minute away, where he retrieved the goods to be delivered. The agents again would recognize such action as consistent with common precautions taken by dealers in drug transactions. If this had been an innocent transaction, it is difficult to explain why the buyer would not just go to the apartment to make the exchange, but as a drug deal, it makes sense that Funches would wait in the alley rather than accompany Munoz to the apartment so as to ensure that the location of the merchandise and the identity of its keepers would be remain unknown to the buyer. Finally, upon Munoz's return, Toro once again acted as an intermediary. He delivered the money to Munoz, and the seller, upon receipt of the money, gave Toro the drugs to deliver to Funches. After delivering the drugs, Toro returned to the Infiniti in order to leave the alley with Munoz.

In reviewing probable-cause determinations, it is common for courts to consider possible innocent alternatives that might explain the facts before the agents. *See*, *e.g.*, *King v. Fletcher*, 319 F.3d 345 (8th Cir. 2003); LAFAVE, *supra*, § 3.2(e), at 69. Of course, the mere existence of innocent explanations does not necessarily negate probable cause, *see United States v. Malin*, 908 F.2d 163, 166 (7th Cir. 1990), but considering innocent, alternative explanations is often helpful. For instance, in *United States v. Ingrao* we found no probable cause when Ingrao, about whom the officers knew nothing, was arrested primarily based on the fact that he was carrying a black, opaque

bag down a gangway between two houses, one of which was a suspected place for drug activity. 897 F.2d 860, 863-64 (7th Cir. 1990). In finding no probable cause, we noted that given the facts before the officers, Ingrao quite plausibly could have been an innocent resident or visitor of one of the other houses adjoining the gangway, a salesman, or someone merely walking down the street. *Id.*

In contrast, no innocent explanations are reasonably apparent as to why Funches, Toro, and Munoz would have conducted their transaction in the way they did. Defendants make only a generalized statement in their brief that the sequence observed by the agents was consistent with any number of innocent exchanges—such as an exchange of gifts. We disagree. Many circumstances of this situation make innocent explanations unlikely, and even implausible. For instance, if this was an innocent exchange, Why use an intermediary? Why relocate from a parking lot to an alley? Why leave one party in the alley while the other travels less than a minute to retrieve goods from an apartment? These actions taken together are difficult to explain as an innocent exchange, but quite easily understood, especially when observed by experienced narcotics officers, as a common method of conducting a drug deal.

When we view the totality of the circumstances surrounding this transaction, we think the inference of illegal conduct by trained and experienced officers is at least as probable as any innocent inference. And we must keep in mind that a finding of probable cause does not require evidence sufficient to satisfy "a reasonable-doubt or even a preponderance standard." *Gerstein*, 420 U.S. at 121.

### III. Conclusion

Given the agents' experience with drug transactions, their observation of a pattern of events that they reasonably

recognized as common in drug deals, and the lack of plausible innocent explanations for the facts before them, we find that there was probable cause to arrest the defendants. Therefore, the district court's decision to suppress the evidence that resulted from the arrest is REVERSED.

A true Copy:

    Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*