ROBERTS, Circuit Judge,
dissenting.
The question for the court is whether the circumstances of the stop and arrest of Tarry Jackson presented “a fair probability that contraband or evidence of a crime [would] be found” in the trunk of the- car he was driving. Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Like the district court, I conclude that they did, and therefore dissent.
The officers who stopped Jackson had good grounds for believing that the ear he was driving had been stolen and that relevant evidence could be found in the. trunk. It was late at night and the tag light was out — suggesting from the beginning of the encounter that Jackson was attempting to obscure the car’s license plates. Once Jackson was pulled over, the . officers learned there was indeed something to hide: the temporary tags affixed to the car had been stolen and altered to match the car’s make, model, and vehicle identification number.
Stolen tags often accompany stolen cars. See, e.g., United States v. Rhind, 289 F.3d 690, 692 (11th Cir.2002) (defendants traveled in stolen car with stolen plates); United States v. Rose, 104 F.3d 1408, 1411 (1st Cir.1997) (same); United States v. Barlow, 41 F.3d 935, 939 & n. 6 (5th Cir.1994) (same). The reason is obvious: by replacing the real tags with stolen tags, the thief makes it impossible for police to identify a stolen vehicle by sight. A stolen vehicle will normally be described by its make, model, and license plate number. An officer cruising the streets cannot readily identify a particular Mercury Marquis as the stolen Mercury Marquis if the original tags have been replaced. See Turner v. United States, 623 A.2d 1170, 1172 (D.C.1993) (officer noting that “a lot of time if a crime was to go down, say like a stolen vehicle, ... license plates can easily be switched” (alteration in original)). So the stolen tags raised a suspicion that the car may have been stolen as well.
The officers’ records check on the vehicle did nothing to dispel this suspicion. Had Jackson been able to produce the car’s registration or had the records check indicated that it was his car, the police would have been reasonably certain they were dealing only with stolen tags, a broken tag light, and a driver with a suspended license. But no such reassurance was forth-coming: Jackson himself could produce no license and no proof of registration, and the records check, which revealed only an old listing for the vehicle, did not show Jackson as the owner.
My colleagues seem to believe that the inconclusive records check somehow dissipated any suspicion that the car was sto *102 len. See Op. at 93. To the officers on the scene, however, the failure of the records check to resolve ownership of the vehicle was unusual. See Hr’g Tr., June 9, 2003, at 9-10 (“Normally if you run [a registration check] haying already run the operator, it’ll tell you that it comes back with an expired listing to that operator. And that was not the case in this case.”) (emphasis added) (Officer Garboe). The fact that Jackson was not listed on the car’s last registration could reasonably have heightened the officers’ suspicion: now they were dealing not only with a car with stolen tags, but with a car that had no recorded connection to Jackson.
Given the cumulation of suspicious circumstances suggesting the ear may have been stolen, the officers, reasonably in my view, turned their attention to the trunk. Why the trunk? One of the officers at the scene would later testify that he had made about ten previous vehicle stops involving stolen tags. Hr’g Tr., June 9, 2003, at 13-14 (Officer Garboe). On six or seven of those occasions, he had found the vehicle’s real tags in the trunk. Id. at 19; see Ornelas v. United States, 517 U.S. 690, 700, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (“our cases have recognized that a police officer may draw inferences based on his own experience in deciding whether probable cause exists”); United States v. Brown, 374 F.3d 1326, 1328 (D.C.Cir.2004) (“ ‘probable cause’ is evaluated not only from the perspective of a ‘prudent man,’ but also from the particular viewpoint of the officer involved in the search or seizure” (citation omitted)).[1] This is not especially surprising: the trunk is certainly a convenient place to stash the real tags once they have been removed from the back of the vehicle. See Brown, 374 F.3d at 1329 (“The trunks of automobiles store items; they also conceal them.”). Real tags in the trunk would clearly be probative evidence suggesting the car was stolen, for the reason just noted: car thieves replace the real tags with stolen ones to help avoid detection.
The real tags were not the only piece of evidence police could have been looking for in the trunk. Given the ample grounds to suspect the car was stolen, the officers certainly had a reasonable basis for supposing that the trunk would contain other items that might have confirmed their suspicion — such as identification or belongings of the real owner — or items that helped connect Jackson to stealing it. Such items could have included “equipment that’s used to steal a car,” such as “a crowbar, or whatever tools one uses to punch an ignition or ... open a locked door.” See Oral Arg. Tr. at 2:20-:27, 3:00-:16 (Jackson’s counsel acknowledging that, had the car been reported stolen, officers might have had reason to search the trunk for such items).
My colleagues offer several reasons why they believe the officers lacked probable cause to search the trunk for evidence that the car was stolen:
1. The concurrence contends that because the car was unregistered, there could be no real tags or other documents for the officers to discover in the trunk. See Cone. Op. at 99. Not so. A vehicle’s *103 license plates do not simply disappear once its registration lapses; many cars roam the roads bearing plates from expired registrations. People get tickets for that all the time, but they are usually able to show that they are the owner listed on the expired registration. Jackson was not able to do that, heightening, the suspicion that he had no legitimate connection to the car.
Moreover, contrary to the majority’s suggestion, finding the expired “real tags” would have provided police with additional evidence of criminal activity. As explained, switching tags is a common ploy of car thieves. And under the majority’s own analysis, see Op. at 94, finding the real tags would have ruled out the possibility the stolen tags were being used only to drive a vehicle that otherwise had no tags, making it more likely that the vehicle had been stolen.
2. The majority doubts the rationale for replacing a stolen vehicle’s real tags with stolen tags and therefore discounts the inference that the car might have been stolen. Op. at 94. But lawyers learn early on that “a page of history is worth a volume of logic.” New York Trust Co. v. Eisner, 256 U.S. 345, 349, 41 S.Ct. 506, 65 L.Ed. 963 (1921) (Holmes, J.). Officer Garboe’s history with stolen tags had confirmed that they, more often than not, led to real tags in the trunk. The reported cases confirm that criminals often use stolen tags on stolen cars. This history is enough to support the officers’ inferring from the stolen tags and the lack of any registration (current or expired) linking Jackson to the car that the car might well have been stolen.
Moreover, replacing a stolen vehicle’s original tags makes sense: it prevents the vehicle from being readily identified as stolen by a passing police cruiser. Of course, the tags may have been reported stolen, and the police can check that, too. But a busy police officer is not going to run a check on the tags of every Mercury Marquis he passes, and people are likely to be much less diligent-about reporting sto-' len tags — particularly temporary ones— than stolen cars.
3. The majority reasons that the officers lacked probable cause because they “were confronted with three possible explanations for the presence of the stolen tags on the car, two of which suggested authorized use and were consistent with the lack of registration and the absence of a report that the car was stolen, and only one of which supported an inference of unauthorized use.” Op. at 94.
Even assuming for the moment the validity of this approach, one of the majority’s “possible explanations” — that stolen tags might be used to conceal an expired registration — does not strike me as probable at all. Using stolen license plates is a serious offense. See D.C.Code Ann. § 22-3232(c) (2001) (receipt of stolen property punishable by up to 180 days in prison if value of property is less than $250, up to seven years if greater than $250). It is unlikely that someone would run so great a risk merely to avoid getting stopped for an expired registration — a steep ticket, to be sure, but not likely to lead to hard time.
The more serious problem is that probable cause does not depend on eliminating other innocent (or, here, less incriminating) explanations for a suspicious set of facts. See United States v. Gagnon, 373 F.3d 230, 236 (2d Cir.2004) (“the fact that an innocent explanation may be consistent with the facts as alleged does not negate probable cause”) (citation omitted); United States v. Funches, 327 F.3d 582, 587 (7th Cir.2003) (“the mere existence of innocent explanations does not necessarily negate probable cause”); see also Gates, 462 U.S. at 243 n. 13, 103 S.Ct. 2317 (“probable cause requires only a probability or sub *104 stantial chance of criminal activity, not an actual showing of such activity ... [and] therefore, innocent behavior frequently will provide the basis for a. showing of probable cause”). Of course, considering alternative explanations is “often helpful,” Funches, 327 F.3d at 587, but the officers were not required, before searching the trunk, to negate the possibility that the stolen tags were used only to drive an unregistered car. This is particularly so here, where any plausible explanation for the circumstances of Jackson’s stop — the broken tag light, the stolen tags, Jackson’s lack of registration, and the failure of the records check to connect Jackson with the vehicle — suggested that Jackson was deliberately trying to conceal unlawful activity involving the car itself.
4. Like the majority, I see no reason why the fact that a vehicle has not been reported stolen should preclude probable cause. See Op. at 98. It may take time for a vehicle’s owner to learn that his car has been stolen. A car being driven at 1:00 a.m. by someone without a license and with no registration, bearing stolen tags, may not have been reported stolen because its owner had retired for the night and would be blissfully unaware of his loss until he awoke the next morning. See United States v. Brigham, 382 F.3d 500, 509 (5th Cir.2004) (en banc) (officer’s suspicion that vehicle was stolen was reasonable “because in his experience, the fact that a vehicle has not yet been reported stolen does not necessarily mean that the vehicle has not actually been stolen”); United States v. Maher, 919 F.2d 1482, 1486 (10th Cir.1990) (probable cause to arrest suspect for stealing trailer where “the trailer bore a stolen license plate; the trailer was unregistered; [suspect] was carrying no ownership documents for the trailer; and [suspect] was unable to provide a complete name or address of the person who allegedly sold him the trailer”); see also United States v. Robinson, 471 F.2d 1082, 1104 n. 38 (D.C.Cir.1972) (en banc) (“some courts have held that when a car has no license plates, or fictitious plates, and the driver cannot produce proof of ownership, probable cause exists to believe that the car may have been stolen, and the officer may ... search [the] car ... for evidence of ownership and •identity”).
The majority nevertheless purports to distinguish Jackson’s case on the ground that “the officers did not ask the driver about ownership prior to searching the trunk and therefore could not evaluate the plausibility of the driver’s explanation.” Op. at 97 - 98. This accords with the majority’s suggestion that the officers might have gathered facts amounting to probable cause if only they had “ask[ed] the driver a few questions” and not “stopped their investigation too soon.” Op. at 95, 96. This is a hazardous approach to assessing probable cause.
The officers who stopped Jackson had no ready means of verifying ownership of the vehicle at the scene. Jackson himself had no license and no proof of registration, and the car had stolen tags. The officers’ records check not only failed to resolve the question of ownership but raised more suspicion: the car itself was not registered and Jackson’s name was not on the old listing. The majority suggests that the officers should have called “the purported owner and ha[d] the owner come to the scene with proof.” Op. at 96. But this assumes that the officers had nothing better to do while on night patrol than linger roadside, tracking down exculpatory leads .for suspects.[2]
*105 The officers could have reasonably concluded that further questioning would have yielded nothing more than the usual story any suspect in Jackson’s situation would be expected to deliver. See Williams ex rel. Allen v. Cambridge Bd. of Educ., 370 F.3d 630, 637 (6th Cir.2004) (“law enforcement is under no obligation to give any credence to a suspect’s story ... nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause” (internal quotation marks omitted)). The best Jackson could do was tell the officers — as he did, at some point — that the car belonged to his girlfriend.[3] Sometimes a car being driven by an unlicensed driver, with no registration and stolen tags, really does belong to the driver’s friend, and sometimes dogs do eat homework, but in neither case is it reasonable to insist on checking out the story before taking other appropriate action. Even if Jackson had provided contact information for his girlfriend in response to inquiries from the officers, and even if the officers had been able to reach the girlfriend and she were responsive to their questions, I cannot see any conceivable value in the over-the-phone testimony of a suspect’s apparent girlfriend — someone unknown to the officers, whose number was given to them by the suspect himself — that an unregistered car with stolen tags, driven by an unlicensed driver, was indeed hers and was being used with her permission.
Finally, my colleagues’ insistence that police should have further questioned Jackson amounts to prescribing preferred investigative procedures for law enforcement. We have neither the authority nor the expertise for such an enterprise. See United States v. Montoya de Hernandez, 473 U.S. 531, 542, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) (“creative judges engaged in post hoc evaluations of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished” (internal quotation marks omitted)). In the end, I would leave the judgment as to what lines of inquiry ought to be pursued to the officer himself, and judge probable cause on the facts as they are, rather than on what they might have been had the officer pursued a different course.
* * * * :!< tfc
I wholeheartedly subscribe to the sentiments expressed in the concurring opinion about the Fourth Amendment’s place among our most prized freedoms. See Cone. Op. at 98, 101. But sentiments do not decide cases; facts and the law do. There is no dispute here on the law: if the officers had probable cause, they did not need a warrant; if they did not have probable cause, no warrant would issue in any event. As for the facts, the officers en *106 countered at 1:00 a.m. an unlicensed driver operating an unregistered car with a broken tag light and stolen tags. The experienced district court judge concluded — and I agree — that “the circumstances were suspicious enough to amount to probable cause to search the trunk.” Memorandum Order, at 5. Right or wrong, nothing about that determination reflected insensitivity to constitutional values, any more than a contrary determination would have reflected insensitivity to the needs of law enforcement.
I respectfully dissent.

. The majority dismisses the officer's testimony out of hand because it "is devoid of the critical circumstances of those searches, including whether the identifying information revealed that the vehicle was stolen.” Op. at 95. I fail to see how this undermines the relevance of the officer’s experience. Whatever the circumstances, the officer noted a strong correlation between stolen tags on a vehicle and the presence of the vehicle’s real tags in the trunk. If Jackson’s attorney had thought that the surrounding circumstances of those stops might undermine the probative value of the officer’s experience, the attorney had ample opportunity to question the officer about them on cross-examination.

. Officer Garboe testified that, if police find proof of ownership they can verify, they ,usu *105 ally call the "registered owner” of the vehicle to ask if he or she would "like to come and get it or ... to have it towed.” Hr’g Tr. at 62. This is very different from the majority's suggestion that police could verify ownership by waiting around for a suspect’s girlfriend to meet them on a District street at one o’clock in the morning. See Op. at 96.

. Because Jackson did not argue below that the police should have conducted a more elaborate investigation, the district court did not make any factual finding as to precisely when the suspect told officers that the car belonged to his girlfriend. Compare Hr'g Tr., June 9, 2003, at 62 (“I don't recall exactly when the conversation took place in which he ... informed us that his girlfriend had purchased the vehicle at an auction.”) (redirect of Officer Garboe) with id. at 70 (Q. "Did you have any information regarding this defendant or anyone else's possible ownership of this particular vehicle prior to the search?” A. "No.”) (Officer Johnson).