**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued September 26, 2011
Decided December 21, 2011

**Before**

RICHARD D. CUDAHY, *Circuit Judge*

RICHARD A. POSNER, *Circuit Judge*

DIANE P. WOOD, *Circuit Judge*

No. 11-1711

| | |
|---|---|
| UNITED STATES OF AMERICA, | Appeal from the United States District |
| *Plaintiff-Appellee,* | Court for the Northern District of Illinois, Eastern Division. |
| *v.* | |
| | No. 08 CR 1028 |
| SHANNON BENNETT, | |
| *Defendants-Appellant.* | Joan B. Gottschall, *Judge.* |

**O R D E R**

This case concerns the stop and arrest of defendant Shannon Bennett after he met with a drug dealer at a shopping mall. Bennett contends that because no law enforcement agent actually witnessed a hand-to-hand transfer of drugs during his meeting with Robert Atkins, a known cocaine dealer, at the Woodfield Mall in Shaumburg, Illinois, there was no probable cause to stop Bennett's vehicle and search his person. However, the Federal Bureau of Investigation had intercepted numerous calls suggesting that Atkins dealt drugs, that he had previously dealt drugs to Bennett and that Atkins was meeting Bennett at the Mall to complete a drug deal. For these reasons, we believe the police had probable cause to suspect that Bennett possessed drugs after his meeting with Atkins. The defendant's other claims of error are meritless and we affirm.

In July 2007, Chicago police officers stopped and searched Bennett shortly after he met with Robert Atkins at the Woodfield Mall. At that time, the FBI was conducting a narcotics-trafficking investigation focused on Atkins. Agents had tapped Atkins' phone and intercepted calls that they interpreted to mean that Atkins intended to sell drugs to Bennett. The FBI also determined that Atkins had distributed narcotics at least six times in the parking lot of the Woodfield Mall.

In June 2007, the FBI had intercepted a call between Robert Wasp and Atkins. The two discussed delivering something to Bennett, also known as Shine.  The next day, the FBI intercepted another call between Wasp and Atkins, in which the parties noted, "It worked for Shine . . . Oh yeah, he liked it." The FBI interpreted these calls to describe a cocaine deal between Atkins and Bennett and that Bennett approved of the delivered cocaine.

In July, the FBI intercepted a call between Atkins and an unknown male, identified as Omar. The contents of this call led the FBI to believe that Atkins had scheduled a drug pick up from a cocaine supplier named Avila. An hour after the call, Atkins met with Avila at Avila's residence. Atkins left Avila's residence carrying a satchel. The FBI believed the satchel to contain cocaine – a belief that later proved to be incorrect. The FBI at this time also believed Atkins had acquired a new supply of cocaine that he wished to sell.

On July 20, the FBI intercepted a series of calls between Bennett, Atkins and various third parties urging Atkins to meet Bennett at the mall. Bennett repeatedly called Atkins, noting that Bennett "need[ed] to get, get that before that traffic gets bad." Based on the location of the meeting at the mall and the vague language used by the parties, the FBI interpreted these conversations as a request for a cocaine deal at the mall. Agents also intercepted calls that they interpreted as an attempt by Atkins to set up a drug deal at the same location with Randy Hamlette. It was learned later that Atkins did distribute cocaine to Hamlette on the day following these conversations.

Atkins did finally meet Bennett at the mall three hours after Bennett first arrived there. The two spoke briefly, then they went to the parking lot. They entered Atkins' car, drove a short distance, and then Bennett left the car. Approximately 75 minutes later, police officers stopped Bennett's car in Chicago. Bennett had not violated any traffic laws. The officers searched Bennett and found a plastic bag containing 122.5 grams of cocaine in his waistband.  The police officers arrested Bennett and he was charged with possession with intent to distribute in violation of 21 U.S.C. §841 (a)(1).

Bennett moved to quash his arrest and suppress all evidence obtained in connection with it with the claim that the officers lacked probable cause to arrest him. The district court denied the defendant's motion to suppress without an evidentiary hearing. Bennett later

pleaded guilty without a written plea agreement, reserving his right to challenge the ruling on his motion to suppress. The case then proceeded to sentencing.

The Probation Office issued a presentence report in connection with Bennett's sentencing determining that the defendant qualified as a career offender under Guideline § 4B1.1. Accordingly, the offense level was calculated at 29 and the criminal history category at VI. The advisory guidelines produced a sentencing range of 151 to 188 months, and Judge Gottschall sentenced Bennett to 151 months.

Judge Gottschall carefully explained the sentencing factors, noting that Bennett was a recidivist but was practically forced into selling drugs by his life situation. After elaborating on the difficulty of the case, Judge Gottschall settled on the lower end of the range, 151 months, noting that such a sentence was required to satisfy her responsibility to protect the public from drug dealing.

On appeal, Bennett argues that the court erred in finding probable cause, in doing so without an evidentiary hearing and in treating the sentencing guidelines as mandatory.

I.

Bennett first contends that there was no probable cause to arrest him because agents did not observe any transfer of drugs and because there are innocent explanations for lingering at a mall for three hours. However, there certainly was sufficient other information to form a basis for probable cause to arrest.

When reviewing a denial of a motion to suppress, factual findings are reviewed for clear error and legal questions are reviewed *de novo*. *United States v. Burnside*, 588 F.3d 511, 516–17 (7th Cir. 2009).

There is probable cause to arrest when the facts and circumstances within an officer's knowledge are sufficient to cause a reasonable person to believe that the suspect has committed or is committing an offense. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Probable cause does not require evidence sufficient to sustain a conviction or to demonstrate that it is more likely than not that the suspect committed a crime. *United States v. Sawyer*, 224 F.3d 675, 679 (7th Cir. 2000). So long as the totality of the circumstances reveals a substantial chance of criminal activity on the suspect's part, probable cause exists. *Id.* Here, the officers had probable cause based on several observations and pieces of information: for example, Atkins' status as a drug dealer, whom the agents believed, based on prior telephone intercepts, was likely to possess drugs; Atkins' past drug deals with Bennett, also based on telephone intercepts; and the behavior of Atkins and Bennett at the mall meeting.

The FBI were aware that Atkins was a significant cocaine trafficker and had previously distributed drugs at the Woodfield Mall. The day before his meeting with Bennett, Atkins had discussed on the telephone the potential purchase of a kilogram of cocaine and apparently had met with a cocaine supplier. Agents had a good faith belief that Atkins received cocaine at that time, and would therefore have cocaine available for sale. That Atkins did not actually obtain cocaine at the meeting with the supplier is immaterial; probable cause remains if the agents' belief was reasonable. *Stokes v. Bd. Of Educ. of the City of Chicago.*, 599 F.3d 617, 622 (7th Cir. 2010), *reh'g denied*, (Apr. 30, 2010). Atkins also attempted to set up a drug deal with another party, Hamlette, at the Woodfield Mall, further supporting the reasonable belief that Atkins was at the mall to sell drugs. *See United States v. Colon*, 549 F.3d 565, 567 (7th Cir. 2008) (agents had probable cause to arrest defendant when he was heard on a wiretap arranging a narcotics transaction and met with known drug dealer at dealer's usual place of business at appointed time).

Agents had good reason to believe that Bennett intended to receive drugs from Atkins. Telephone intercepts between Atkins and Wasp indicated that Atkins had previously supplied drugs to Bennett. Atkins, in discussing an apparent drug run, told Wasp that he "wanna take it up to the Shine crib." Bennett went by the alias Shine. The following day, Wasp called Atkins to "see[] how that was yesterday." Atkins replied that "it worked for Shine . . . he liked it."

Bennett's conduct on the day of his arrest comports with a finding of probable cause. Bennett placed a series of calls to Atkins, both directly and through intermediaries, to set up a meeting with Atkins on July 20. Bennett called repeatedly to confirm that Atkins would meet him at the Mall. Bennett's urgency stemmed from his desire to "get that before the traffic gets bad." Agents interpreted this to mean that Bennett wanted to purchase cocaine before rush hour. *See United States v. Black*, 73 Fed. Appx. 884, 887 (7th Cir. 2003) (probable cause finding was supported in part by defendant's "unsolicited calls [to a known drug dealer] demanding to know where he was and why he was delayed"). Bennett then apparently called Wasp, asking him to hurry Atkins along. Then, after waiting more than three hours at the mall, Bennett met with Atkins briefly. They both left the mall and entered Atkins' car. They drove a short distance, after which Bennett left the car. This entire sequence took no more than five minutes. Although the agents did not actually observe a hand-to-hand transfer, the behavior of Bennett and Atkins was consistent with such a transfer. This court has found similar conduct to support a finding of probable cause and we see no reason to deviate from this interpretation. *United States v. Parra*, 402 F.3d 752, 765 (7th Cir. 2005); *United States v. Funches*, 327 F.3d 582, 586 (7th Cir. 2003); *United States v. Carrillo*, 269 F.3d 761, 766 (7th Cir. 2001).

Bennett contends that there are innocent justifications for each of these conversations and interactions with Atkins. However, this does not negate probable cause. *Funches*, 337 F.3d at 582. Bennett's actions are "difficult to explain as an innocent exchange, but quite easily understood . . . as a common method of conducting a drug deal." *Id.* at 587. Taken together, the facts lend credence to the notion that Atkins was in possession of drugs, had previously dealt drugs to Bennett and that Atkins and Bennett met at the mall for a drug exchange.  Therefore, the district court correctly denied Bennett's motion to suppress.

Bennett also argues that the court erred in declining to order an evidentiary hearing, but this is reviewable only for abuse of discretion. An evidentiary hearing is required only if there are disputed issues of fact. *United States v. Villegas*, 388 F.3d 317, 324 (7th Cir. 2004). Here, Bennett does not contest the calls or the surveillance that precipitated probable cause. He does not deny the words uttered by, or the location of, the participants. He does not deny that his alias is Shine.  Instead, he disputes the government's interpretation of the evidence. But this is not a factual question; the only issue is the legal effect attributable to the facts and this does not require or justify an evidentiary hearing. *United States v. Villalpando*, 588 F.3d 1124, 1128 (7th Cir. 2009); *United States v. Kunda*, 2001 WL 1543519, at *4 (N.D. Ill. Dec. 3, 2001).

II.

Finally, Bennett argues that the district court imposed an unreasonable sentence. This again invokes a deferential abuse-of-discretion standard. *United States v. Jackson*, 547 F.3d 786, 792 (7th Cir. 2008).  A sentence that falls within the guideline range is presumptively reasonable.  *Rita v. United States*, 551 U.S. 338, 347 (2007). Bennett contends that the district court's apparent reluctance to impose a sentence of 151 months represents not an in depth balancing of the 18 U.S.C. § 3553 sentencing factors but a misunderstanding of the advisory nature of the sentencing guidelines. Bennett argues that the district court felt the sentencing guidelines were mandatory. He supports this with quotes from the sentencing hearing, in which Judge Gottschall noted that she had "struggled with this case, and I know no one is going to be very happy with what I'm going to do, but I think I've got to go with the guidelines."

However, it is clear that Judge Gottschall knew that the guidelines were not mandatory and that she arrived at the sentence through meaningful consideration of the appropriate sentencing factors. The district court's comment that it thought it had to go with the guidelines does not mean that it thought the guidelines were mandatory. In the context of her discussion, it is clear that Judge Gottschall felt she had to issue a sentence within the advisory range in order to protect society.  Immediately before pronouncing sentence, Judge Gottschall stated, "I've got to deal with the sympathy I have for everything that Mr. Bennett

has gone through . . . but I've got to also consider my public responsibilities to everyone else . . . . [Drug dealing] hurts the whole society, and I'm also charged with protecting them." Defense counsel also reminded Judge Gottschall during sentencing that she could exercise her discretion, "Judge, you now have the ability, and you have for some time now . . . where you're able to say . . . you have to look [at each case] specifically." From this, it is clear that the district court gave "meaningful consideration of the factors enumerated in 18 U.S.C. § 3553(a)" and the resulting sentence "is objectively reasonable in light of the statutory factors and the individual circumstances of the case." *United States v. Shannon*, 518 F.3d 494, 496 (7th Cir. 2008) (citations omitted).

AFFIRMED.