# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 12-2790

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

THEODORE RICHARDS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 CR 993—**Milton I. Shadur**, *Judge*.

ARGUED APRIL 5, 2013—DECIDED JUNE 14, 2013

Before EASTERBROOK, *Chief Judge*, and FLAUM and WOOD, *Circuit Judges*.

FLAUM, *Circuit Judge*. As Theodore Richards tells it, he was the unwitting stooge of California drug dealers who flew him from California to Chicago on a mission to pick up and transport money but, unbeknownst to him, sent him home with ten kilograms of cocaine instead. Unfortunately for him, a joint federal-state task force had his pick-up site under surveillance in

coordination with a controlled buy scheduled to occur there that day. Officers stopped Richards, too, and discovered the cocaine. A jury convicted him of possession with intent to distribute after he took the stand in his own defense and after the government introduced taped phone calls in which Richards talked about unrelated drug activity. Richards appealed, challenging the district court's denial of his motion to suppress, its denial of his motion to exclude the phone calls under Rule 404(b), and the government's use of the phone call evidence during closing arguments. Because the government improperly relied on the phone calls to argue propensity, we now vacate Richards's conviction and remand for a new trial.

## I. Background

### A. Factual Background

On November 21, 2010, federal and state police took up surveillance around the house located at 109 South Pinecrest in Bolingbrook, Illinois. In their sights was Juan Regalado, a suspected high-level drug dealer. Police had converged on the Pinecrest house that day because an undercover police officer was scheduled to purchase a large amount of cocaine there.

The operation required some advance work. First, the undercover officer met with Regalado at his ranch in Frankfort, Illinois. The day of the transaction, November 21, the officer rendezvoused with a lead car at an offsite location and then followed that lead car to the

Pinecrest house. Upon arrival, the lead car left, and the officer pulled his car into the driveway. He backed into the garage, where the plan called for Regalado's men to load cocaine into a trap compartment accessed through the trunk of the officer's car. Opening the trunk, however, prevented the officer from pulling his car completely into the garage; this protrusion in turn prevented the garage door from closing. Regalado's men loaded bags into the trunk, and the officer left. Officers later confirmed that the bags contained ten kilograms of cocaine. Officers continued surveillance of the Pinecrest house because the undercover officer suspected additional drugs remained on the property.[1]

About twenty minutes later, a silver pick-up truck arrived. The driver exited the car, entered the home, and returned to the truck after a short conversation with an occupant of the house. Officer Kenneth Mok, one of

---

[1] Richards heavily attacked the government's reliance on the undercover officer's statements that additional drugs remained but the district court ultimately disagreed:

> [Y]ou criticize the Government's assertion that Officer Mok later learned that the undercover officer stated that there appeared to be more drugs in the garage. Now, you have read "appeared" as literally, that is, something viewed. But that usage I think carries the concept of taking all the circumstances into account inadequate—"appeared" I think is not used there literally but rather it is in the terms of—seemed likely is I think a fair reading of the use of that word. So an attempt to make sort of a mountain out of a nonexistent molehill doesn't help us a great deal.

the surveillance officers, followed the pick-up after it departed the Pinecrest property. The truck ultimately met another car in a mall parking lot, a gray Lexus. The truck drove slowly past the Lexus and, as far as Officer Mok could tell, neither driver communicated with the other. The pick-up led the Lexus back to the Pinecrest house and then left. The Lexus, meanwhile, backed into the garage. The garage door closed. When it reopened ten minutes later, the Lexus emerged and drove away from the property with Officer Mok following behind.

While tailing the Lexus, Officer Mok received confirmation that the substance loaded into the undercover officer's car had tested positive for cocaine. After an hour of surveillance during which the Lexus violated no traffic laws, Officer Mok stopped the car. The defendant, Theodore Richards, was driving the car, and Nickelle Rodgers sat in the passenger seat. Officers questioned the pair.

Richards presented a California driver's license and, when asked who owned the car, admitted several times that it was not his. He never named the owner, however, until Officer Mok asked if the name "Jason Cook"—which Officer Mok had obtained from the vehicle registration—sounded familiar. According to Richards, Cook was his cousin. Richards told Mok he had flown in from Bakersfield, California, and had picked up Rodgers from Indianapolis to go on a date. The two were on their way to get something to eat, Richards explained. For her part, Rodgers told the police that she and Richards had been playing video games at another

house and were on their way to grab a bite to eat. Neither mentioned their stop at the Pinecrest house.

Without consent, police searched the car and found a backpack in the trunk. It contained about ten kilograms of cocaine. Both Richards and Rodgers denied ownership of the bag and both were arrested. None of the officers involved in the operation had—before the gray Lexus arrived at the Pinecrest property—any information connecting either Richards or Rodgers with Regalado nor did the officers have any specific information (aside from the undercover officer's suggestion that more drugs may have been at the Pinecrest house) suggesting another drug deal would occur that day.

## B. Procedural History

The government charged Richards with one count of possession of more than five kilograms of cocaine with intent to distribute. Richards moved to suppress the cocaine, arguing that the government lacked probable cause to stop and search the gray Lexus. The district court disagreed, concluding that Richards "tr[ied] to separate the strands of the information on which the officers acted as though they somehow ought to be looked at separately rather than together." And viewing all the information together—the undercover officer's drug buy, the similarities between the undercover officer's approach and Richards's approach in the gray Lexus, and the undercover officer's suggestion that the Pinecrest property may have housed more drugs—the

district court found probable cause. It denied the motion, and the case proceeded to trial.

At trial, Richards's primary defense rested on the assertion that he thought the backpack contained money, not drugs. He took the stand in furtherance of that defense. According to Richards's testimony, he had borrowed $50,000 from some Latinos that he knew collectively only as the Pelon brothers. He needed the money to start a trucking company with his cousin, but the company faltered when his cousin—the driver—became ill. Unable to repay his loan, the Pelons enlisted Richards's assistance transporting packages, telling him that his help would repay the debt. According to Richards, he transported several packages for the Pelons, all of which he opened (against orders from the Pelons) and all of which contained money. Usually, Richards would communicate with the Pelons and obtain his instructions by meeting them at a ranch. Each time he visited the ranch, he testified, about thirty people were present "doing work and doing things." Moreover, Richards explained that at the ranch, "[e]verybody called each other Pelon. That was the term that they used amongst each other."

Richards also told the jury why he thought the Pelons wanted his trips transporting money to remain secret:

> Well, I knew [the Pelons] were over here illegally. And they ran a lot of different businesses and stuff. And I also knew about strip clubs and prostitution. And I was being told about things about people sneaking over through the border, or whatever. That is what they said. There was also like—people that

were also out at the ranch, they were also involved in
drugs. But they never told me so I don't know.

Finally, Richards explained how the trip that led to
his arrest came about. He received instructions from
"Pelon" and was told he would travel to Chicago to
transport money. As instructed, he waited until a
gray truck drove by and then proceeded to the Pinecrest
property where individuals loaded a dark backpack into
his trunk. According to Richards, he was "shocked, con-
fused" when officers removed the cocaine from his
trunk because "[i]t wasn't supposed to be in [his] car."
Richards also testified that he had never been told he
would pick up drugs in any of his "conversations with
the Pelon brothers or with their associates."

In cross-examining the defendant, the government
asked Richards if he had ever talked on the phone with
a man named Juan Beltran, which the defendant denied.
The government also accused Richards of conversing
with Beltran or another person regarding the need to
obtain drugs. Richards admitted that he used marijuana
but specifically denied discussing cocaine with anyone.
On re-direct, Richards told the jury that he would talk
with his brothers Lou and Chuckie about marijuana.
Lou, he explained, was at the Pelon brothers' ranch "all
the time." And while Lou was at the ranch, Richards
continued, he went by the name "Pelon." Lou, however,
was not involved in Richards's trip to Chicago that ulti-
mately culminated in Richards's arrest.

Given this testimony, the government offered a brief
rebuttal case involving taped phone conversations

between Richards and a Bakersfield man named Juan Beltran. According to Drug Enforcement Administration Agent Shawn Riley, who monitored the wiretap on Beltran's phone during an unrelated investigation, Beltran also went by the alias "Pelon." The conversations all occurred in the days leading up to Richards's arrest. In them, Beltran and Richards discussed drug quantity and drug quality. Although Beltran and Richards never specifically mentioned any drugs by name, Riley testified that, based on his prior experience investigating drug transactions and listening to wiretaps, the language Beltran and Richards used indicated that the two were discussing cocaine.

Richards moved to exclude the phone calls as improper prior bad acts evidence. *See* Fed. R. Evid. 404(b). In the two months that Riley listened to the wiretap on Beltran's phone, Beltran never talked about transporting money or drugs in Bolingbrook. According to Richards, these tapes were improper evidence because the government could not show that Beltran (also known as Pelon) was the same Pelon who sent Richards to Chicago. Richards also challenged introduction of the evidence on grounds that the government did not comply with Rule 404(b)'s notice requirement. For its part, the government acknowledged no definitive connection between Beltran and the Pelon brothers. Nevertheless, the government argued that nexus to the criminal trafficking in this case was unnecessary: Richards had professed complete ignorance as to how the drug trade worked and these phone conversations undermined that assertion by showing Richards's familiarity with the drug trade more generally, thus proving probative of

Richards's knowledge that the bag contained cocaine. *See* Fed. R. Evid. 404(b)(2) (permitting use of prior bad act to show defendant's knowledge). The district court agreed and, after a voir dire of Agent Riley and review of the tapes, permitted Agent Riley to testify regarding some but not all of the conversations between Beltran and Richards.

This evidence of the phone calls between Beltran and Richards became the centerpiece of the government's closing argument. Shortly into the argument, the prosecutor began referring to Richards as a "cocaine dealer." With little delay, the government explained how it reached this conclusion: the California calls required it. In particular, the prosecutor identified one call between Beltran and Richards in which Richards complained of poor quality drugs. "[T]he defendant knew this cocaine was terrible quality based on the packaging and just by looking at it," the prosecutor told the jury. "How does he know that?" she asked. "Because he is a drug trafficker." At this point, defense counsel objected, suggesting that the California calls were being used for propensity in violation of Rule 404. The district court admonished defense counsel for interjecting during closing arguments but did provide a mid-argument instruction that cautioned the jury against inferring guilt solely from evidence of Richards's prior bad acts.

The government pressed on, continuing to characterize Richards as a "cocaine dealer" and a "drug trafficker" and arguing that such status required the inference that Richards knew the backpack contained drugs, not money. For example, immediately after quoting defen-

dant's words in the phone calls, the prosecutor told the jury: "Now, based upon the defendant's own conduct on November 21st, 2010 and his own statements, when you use your common sense, there can be only one con- clusion, the defendant, a cocaine dealer, knew exactly what he was transporting on November 21st of 2010." The theme continued in rebuttal:

- The only thing that is disputed is whether the defendant knew he had just picked up ten kilo- grams of cocaine. And in answering that question think about what is reasonable and what makes sense. And there is [sic] two things in particular that will help you answer that question. The de- fendant is a cocaine dealer and the defendant is a liar.

- But if we have met our burden on the instruction that will be given, then the California calls are absolutely relevant to knowledge and intent on November 21st. And the Judge will instruct you as much. To think that that is not relevant is ab- surd. He is a cocaine dealer.

- The problem is you have heard what the defendant sounds like when he doesn't think anyone is listening, when he doesn't think anyone is watch- ing. You heard the calls. You reviewed the tran- scripts. When he doesn't think anyone is listening, he is a cocaine dealer. When he thinks people are watching and listening, he is back to poor me, I was just delivering money to pay back the loan. That is absurd.

- And we are not saying the ten kilos of cocaine were connected to the intercepted call from California. We are not arguing that. We are not saying that. Clearly the defendant's drug dealing is not limited to California. It happens here too.

- These layers of concealment are used to give drug dealers plausible deniability. But that doesn't work for the defendant because we already know he is a cocaine dealer.

The government relied solely on the California calls as evidence to support its characterization of Richards as a drug dealer. And it did not connect drug dealing in the abstract with the specific patterns in this case. For example, nothing in closing remarks suggested that drug couriers (as opposed to money couriers) use the lead-car approach or that a drug dealer would know that a pick-up conducted as occurred in this case would involve drugs, not money.

At the end of closing arguments, defense counsel requested a sidebar and again complained that the government had used the California calls to argue propensity. The district court again disagreed, stating "I don't think that is fair. I think that the 'don't believe him' was contrasting his statements with what they say the evidence reflects. And that is perfectly permissible."

Richards now appeals the district court's denial of his motion to suppress. He also challenges the district court's decision to admit the California calls and its approval of the government's use of those calls in closing.

## II. Discussion

### A. The Undercover Officer's Controlled Buy Generated Probable Cause to Search the Gray Lexus

The Fourth Amendment protects citizens against unreasonable searches and seizures. Ordinarily, warrantless searches are presumptively unreasonable. Cars, however, are exempted from the warrant requirement provided officers have probable cause to believe the car contains contraband. *United States v. Slone*, 636 F.3d 845, 848 (7th Cir. 2011); *see also Florida v. White*, 526 U.S. 559, 564-65 (1999); *Carroll v. United States*, 267 U.S. 132, 160-62 (1925). When officers have such probable cause, the search may extend to "all parts of the vehicle in which contraband or evidence could be concealed, including closed compartments, containers, packages, and trunks."[2] *United States v. Williams*, 627 F.3d 247, 251 (7th Cir. 2010). We review de novo a district court's conclusion regarding probable cause. *Id.*

Probable cause exists when "based on the known facts and circumstances, a reasonably prudent person would believe that contraband or evidence of a crime will be found in the place to be searched." *Id.* This requires a "common-sense judgment" based upon the

---

[2] This probable cause also justifies the initial, warrantless stop of the car that, as a seizure under the Fourth Amendment, requires its own justification—be it the reasonable suspicion needed for a *Terry* stop or the probable cause necessary for a full stop. *E.g.*, *United States v. Bueno*, 703 F.3d 1053, 1059 (7th Cir. 2013).

totality of the circumstances. Officers may "draw reasonable inferences based on their training and experience in making that determination." *Id.* Probable cause does not require information sufficient to support conviction or even enough to show a preponderance of the evidence. *Id.* at 252. A "fair probability of discovering contraband" is enough. *Id.* Richards presents a close case. Nevertheless, we believe that the facts and circumstances known to officers at the time of the stop provided probable cause to believe the Lexus had picked up drugs during its brief stop at the Pinecrest residence. As a result, officers had a "fair probability of discovering contraband" in the gray Lexus, justifying the stop and search under the Fourth Amendment.

First, officers knew their inside man had purchased ten kilograms of cocaine at the Pinecrest residence less than an hour before the gray Lexus arrived.[3] The white substance loaded into the trunk of the undercover officer's car had been confirmed as cocaine through a field chemical test before Officer Mok stopped the Lexus. Second, officers knew that the approach of the gray Lexus mirrored that of their undercover officer: At a different location, both cars met another vehicle

---

[3] Our reliance on the timing of the undercover officer's high-volume drug purchase relative to Richards's arrival does not establish any rigid, temporal requirements for finding probable cause. Instead, we simply note that, on these facts and circumstances, the relative timing of the undercover officer's buy and Richards's arrival at the Pinecrest house supports officers' probable cause determination.

that led them to the Pinecrest residence. After arrival, the lead car left as both Richards and the undercover officer backed into the garage where both remained for less than ten minutes. And after that short period had elapsed, both cars left the Pinecrest house. Given all this information, a reasonable officer could say with a fair probability that the gray Lexus had picked up drugs from the Pinecrest house.

Unsurprisingly, Richards emphasizes what remained unknown to the police. According to him, the police had no evidence linking him to Juan Regalado, the target of their sting, and no information indicating a second, scheduled drug purchase that day. But "[o]ne can always point out informational gaps, [and] the probable cause inquiry asks what a law enforcement officer knew rather than what he did not." *Slone*, 636 F.3d at 849. No doubt, these facts would have solidified probable cause but their absence does not lessen the probable cause generated by the highly unusual approach the Lexus took to arrive at the Pinecrest residence, when an undercover officer had used the exact same approach (albeit with a different lead car) to arrive at the house in anticipation of purchasing a large amount of drugs.

Indeed, officers need no advance notice that a drug deal will occur to have probable cause that they have just witnessed one. In *United States v. Funches*, for example, officers knew none of the defendants was "the man for whom they were looking and had no information that [they] were involved in drug trafficking[.]" 327 F.3d 582, 584 (7th Cir. 2003). The officers followed defendants' car

anyway. In doing so, they eventually witnessed defendants' car meet a Nissan Altima in a supermarket parking lot. *Id.* After brief interaction among the occupants of the cars, defendants' car led the Altima to an alley and then drove to a nearby apartment. A woman exited the apartment with a gray bag and passed that bag through the window of defendants' car, which returned to the alley. *Id.* At that point, the defendants in the two cars exchanged the gray bag for a gold bag. *Id.* That sequence of events, *Funches* concluded, provided officers with probable cause to believe a drug deal occurred because "agents would recognize such action as consistent with common precautions taken by dealers in drug transactions." *Id.* at 586-87.

And in *Williams*, officers suspected drug activity at a particular residence. They confirmed that activity through wiretapped phone calls and the arrest of an individual leaving the house with a package containing two kilograms of cocaine. 627 F.3d at 251-52. Additional phone calls suggested a meeting at the residence with a "black guy." *Id.* at 249. This prior drug activity combined with the phone call describing the meeting provided probable cause to search a car when the *Williams* defendants had entered the residence with a shoebox, left fifteen minutes later carrying the same shoebox, and then drove away. *Id.* at 251-52.

The officers' knowledge in this case combines the suspicious vehicular relocation of *Funches* with the prior confirmation of drug activity in *Williams*. The circuitous approach that Richards took to the Pinecrest

house—meeting another car at an offsite location that led Richards to the house—is not unlike the sequence of events in *Funches* and not the sort of travel that an innocent acquaintance would employ when visiting a friend.[4] *See also Slone*, 636 F.3d at 850-51 (probable cause to find involvement in drug transaction when one car followed another car, known to contain drugs, for a circuitous and extended route); *United States v. Soto*, 375 F.3d 1219, 1222-23 (10th Cir. 2004) (probable cause to find involvement in drug transaction when vehicle entered gas station parking lot near site of deal, slowly circled, and parked without patronizing gas station). Indeed, the vehicular maneuvering in this case—meeting a lead car at a different location who would escort the buyer to the Pinecrest residence—justifies even stronger conclusions of suspicious activity because unlike in *Funches*, an undercover officer had participated in nearly identical maneuvers immediately prior to purchasing drugs.

And just as in *Williams*, where officers confirmed drug dealing activity through a prior arrest, 627 F.3d at 251-52, here, officers had prior confirmation of drug dealing activity through the undercover officer's recent

---

[4] Richards suggests some ambiguity regarding whether both cars backed into the garage. The district court did not make explicit factual findings in this regard but, in denying the motion to suppress, did appear to credit the government's testimony over that of the defendant. In any event, the outcome of this case does not hinge on that fact.

purchase.[5] Indeed, *Williams* itself highlights the factual similarity to this case: "[T]he totality of the facts and circumstances—that [the defendants] met Hinojosa and Barmbila (suspected drug dealers) at the Monitor residence (a suspected stash house), where agents knew Hinojosa and Barmbila had carried out a drug transaction as recently as the day before, and that [the defendants] left that meeting carrying a shoebox (in which they could conceal drugs)—were sufficient to create probable cause even absent such details in the [wiretapped] calls." *Id.* at 252. Officers' knowledge in this case presents nearly identical facts and circumstances. Richards met suspected drug dealers at a suspected stash house and left the property in precisely the same way a confirmed buyer had left not an hour

---

[5] Richards finds *Williams* less analogous to this case because in *Williams*, the police had intercepted phone conversations suggesting a "meeting" with a "black guy" at the residence where officers had previously observed the drug activity. 627 F.3d at 249. But as explained above, probable cause does not require advance notice that a drug deal will occur. All it requires is a "fair probability" based on all the facts that a drug deal occurred. Nor does the fact that Richards's lead car differed from the escort provided to the undercover officer distinguish *Williams*, as Richards suggests. Drug dealing operations are not shielded from probable cause simply by hiring different individuals to fill similar roles in the organization.

before.[6] On top of all this stands Officer Mok's extensive experience investigating drug operations: a twenty-year veteran of the Chicago Police Department, Mok had spent four years on the DEA task force at the time of the Richards arrest. Thus, the "totality of the circumstances"—and the factual similarity to both *Funches* and *Williams*—"when considered in light of [Officer Mok's] training and experience, gave [him] sufficient reason to believe that there was a significant probability that" Richards had committed a crime. *United States v. Parra*, 402 F.3d 752, 765 (7th Cir. 2005).

Richards relies heavily on the well-settled proposition that mere proximity to suspected criminal activity does not, without more, generate probable cause. Richards accurately states the law, *see United States v. Bohman*, 683 F.3d 861, 864 (7th Cir. 2012); *United States v. Ingrao*, 897 F.2d 860, 863 (7th Cir. 1990); *see also Illinois v. Wardlaw*, 528 U.S. 119, 124 (2000); *United States v. Ceballos*, 654 F.2d 177, 185 (2d Cir. 1981), but this rule does not apply to him: officers could reasonably conclude from his actions and the undercover officer's reports that Richards was not simply proximate to criminal activity but a participant in it. Neither *Bohman* nor *Ingrao* aids Richards as much as he suggests. In *Bohman*, police stopped a car exiting property that officers suspected of

---

[6] Richards disputes the government's characterization of the Pinecrest property as a stash house. Regardless of how one defines "stash house," no one disputes that an undercover officer had purchased ten kilograms of cocaine there.

housing a methamphetamine lab. 683 F.3d at 863-64. That suspicion resulted from a tip they had received, but when police stopped the car, they had not yet corroborated the tip in any way. *Id.* at 864-65. *Bohman* found no reasonable suspicion for the stop because the only information pointing to criminal activity was the defendant's emergence from property that an uncorroborated tip accused of housing a meth lab. *Id*. That alone was insufficient.

*Ingrao* involved similar facts. Officers in that case arrested the defendant after he emerged from a gangway between two houses while carrying a black, opaque bag. 897 F.2d at 861. Officers could not, however, connect the *Ingrao* defendant to the house on either side of the gangway. *Id.* at 863-64. That fact proved significant, for one of the houses belonged to an individual whom police had been investigating. *Id.* at 861. Police had, however, observed suspicious activity by other individuals emerging from the gangway. *Id.* Ultimately, police lacked probable cause to arrest the *Ingrao* defendant because his only connection to the previously observed suspicious activity was his presence in the gangway between the two homes. *Id.* at 863-64.

Richards is unlike the defendants in *Bohman* and *Ingrao*. For one thing, officers did not act merely on uncorroborated information. The Pinecrest house was a confirmed drug den—an undercover officer had just purchased ten kilos of cocaine there and suspected still more product remained. Thus, officers had far more incriminatory information regarding activity at the

Pinecrest house than the *Bohman* officers did in their uncorroborated tip. For another, Richards did not simply emerge from the location of criminal activity as both the *Bohman* and *Ingrao* defendants did. Perhaps *Bohman* and *Ingrao* would require reversal if officers' first glimpsed Richards as he pulled out of the Pinecrest garage. But they saw much more: They saw a lead car leave the Pinecrest property and meet him in a parking lot. They saw him follow that car back to the Pinecrest property. And they saw him back into the garage, and then leave. Each of these actions directly mirrored the approach of the undercover officer in his drug buy, thereby permitting the reasonable inference that, like the officer, Richards arrived to pick up drugs. Thus, there is "far more in this case . . . than . . . mere physical proximity" to the criminal activity. *United States v. Burrell*, 963 F.2d 976, 987 (7th Cir. 1992).

In short, the facts known to officers created a fair probability that Richards's car contained drugs, even though officers had never before seen Richards and had no prior indication that Richards planned to pick up large amounts of cocaine from the Pinecrest residence. An undercover officer had previously purchased large amounts of cocaine from the property and believed more drug product remained onsite. Less than an hour after the undercover officer left, Richards arrived under the same travel protocol that the undercover officer used when purchasing the drugs. These facts and circumstances generate a fair probability that Richards had picked up drugs just as the undercover officer had.

We emphasize again that Richards presents a close case. Were it not for the undercover officer's drug purchase within the hour and the strong similarity between the actions of the undercover officer and the gray Lexus, the police would surely have lacked probable cause to stop Richards. As such, that the Lexus followed another car to the Pinecrest residence would not, standing alone, provide probable cause. Likewise, neither would the Lexus's association with the Pinecrest property solely provide probable cause. But the combination of Richards's behavior and the undercover officer's high-volume drug buy less than an hour before is enough. For that reason, we affirm the district court's denial of Richards's motion to suppress.

## B. The District Court Did Not Abuse Its Discretion in Admitting the California Calls as Probative of Knowledge

We also find no error in the district court's admission of the California calls. Evidence of a defendant's prior bad acts is inadmissible to show propensity to commit a crime. Fed. R. Evid. 404(b)(1). Such evidence is admissible, however, if the evidence is relevant to an issue in question other than the defendant's propensity to commit the charged crime. Fed. R. Evid. 404(b)(2); *e.g.*, *United States v. Baker*, 655 F.3d 677, 681 (7th Cir. 2011). Additionally, we also consider whether the prior acts are similar enough and close enough in time to be relevant and whether the evidence is sufficient to support a jury finding that the defendant committed the

act. *E.g.*, *Baker*, 655 F.3d at 681. Finally, as with all evidence, the danger of unfair prejudice must not substantially outweigh its probative value. Fed. R. Evid. 403; *see also Baker*, 655 F.3d at 681-82.

We review the district court's admission of evidence under Rule 404(b) for an abuse of discretion. Even when an abuse of discretion occurs, however, reversal follows only if admission of the evidence affected the defendant's "substantial rights." Fed. R. Crim. P. 52(a); *United States v. Hicks*, 635 F.3d 1063, 1069 (7th Cir. 2011). In making that evaluation, we "gauge what effect the error had or reasonably may be taken to have had upon the jury's decision." *Hicks*, 635 F.3d at 1069 (citing *United States v. Zapata*, 871 F.2d 616, 622 (7th Cir. 1989)). Importantly, nothing "suggest[s] that after-the-fact remarks during closing argument have any bearing on the district court's original Rule 404(b) determination." *United States v. Kieffer*, 68 F. App'x 726, 730 (7th Cir. 2003) (non-precedential). Thus, the prosecutor's use of Rule 404(b) evidence during closing presents a question separate from whether the court properly admitted the evidence in the first place.

Richards wages three attacks on the district court's admission of the California calls. First, he argues that the tapes are not relevant to knowledge, the non-propensity issue proffered to justify their admission. Second, he argues that the cocaine transactions discussed on the tapes are not similar enough or temporally proximate enough to be relevant. And third, Richards argues that the potential for unfair prejudice outweighs the probative value of the evidence.

**1.  The California Calls Are Relevant to Richards's Knowledge That the Bag Contained Cocaine**

We have recently cautioned that district courts have too readily admitted prior bad acts evidence in drug cases. *United States v. Miller*, 673 F.3d 688, 696 (7th Cir. 2012) ("[A]dmission of prior drug crimes to prove intent to commit present drug crimes has become too routine."); *see also United States v. Jones*, 389 F.3d 753, 756-58 (7th Cir. 2004), *vacated on other grounds by* 545 U.S. 1125 (2005). Rule 404, however, does not present an insurmountable barrier to admission of prior bad acts evidence. To begin, "[i]dentification of an at-issue, non-propensity Rule 404(b) exception is a necessary condition for admitting the evidence[.]" *Miller*, 673 F.3d at 697. Thus, district courts must consider "*specifically* how the prior conviction tend[s] to" serve the non-propensity exception. *Id.* at 699 (emphasis added). Additionally, not only must the evidence be relevant to a valid non-propensity issue, the a defendant must also "meaningfully dispute" that non-propensity issue. *Miller*, 673 F.3d at 697.

We find both requirements satisfied in Richards's case and thus see no error in the district court finding the California calls probative of a non-propensity purpose. First, knowledge is a valid non-propensity purpose, and Richards placed his knowledge of the bag's contents directly at issue when he took the stand and testified that he believed the bag contained money, not drugs. Second, a "specific" link exists between the calls and Richards's testimony, making the calls relevant to his knowledge of the bag's contents.

### a. Richards's Defense Put His Knowledge of the Bag's Contents Directly in Issue

A defendant must "meaningfully dispute" the non-propensity issue justifying admission of the Rule 404(b) evidence. *Miller*, 673 F.3d at 697. Thus, if the defendant simply asserts his innocence in a more general way or argues his conduct failed to satisfy some other element of the crime besides intent or knowledge, prior bad acts evidence is inadmissible. *Id. Miller* illustrates the more general defense assertions that would not meaningfully dispute a Rule 404(b) exception. In that case, the defendant—on trial for possession with intent to distribute—did not dispute intent. (That police found the large quantity of drugs at issue packaged into smaller bags with price tags attached made that a tough sell.) Nor did he suggest he failed to recognize the substance as cocaine. Instead, he argued simply that the drugs belonged to his girlfriend. *Id.* at 699. His defense did not meaningfully dispute intent or knowledge so introduction of his prior convictions for drug offenses proved intent only to the extent that intent collapsed into propensity: "He intended to do it before . . . so he must have intended to do it again." *Id.*; *cf. Jones*, 389 F.3d at 757 ("Propensity and intent are two different things, however, even if only a fine line sometimes distinguishes them.").

Richards directly and specifically disputed his knowledge of the bag's contents. On the stand, Richards described traveling to a ranch with at least thirty individuals on the property, all known as "Pelon." He

also admitted his awareness of criminal activity originating from the ranch:

> And [the Pelon brothers] ran a lot of businesses and stuff. And I also knew about strip clubs and prostitution. And I was being told about things about people sneaking over through the border, or whatever. That is what they said. There was also like—people that were also out at the ranch, they were also involved in drugs. *But they never told me that, so I don't know.*

(Emphasis added.) He acknowledged that his own brother purchased drugs, marijuana, at the ranch and that, while there, his brother went by "Pelon" just like everyone else. And Richards also explained how his trip to Bolingbrook originated at the Pelon ranch—a trio of brothers, all known as Pelon, brought him to the ranch where he received instructions about picking up and transporting money to pay back a debt. Thus, Richards told the jury, when he picked up the bag from the Pinecrest house, he believed it contained money and not drugs.[7]

---

[7] We pause to note that trafficking drug money is, under most circumstances, no less a federal crime than trafficking the drugs themselves. *See* 21 U.S.C. § 846 (criminalizing conspiracy to violate the drug laws); *cf. United States v. Saenz*, 623 F.3d 461 (7th Cir. 2010) (affirming conviction under § 846 when defendant transported drug money). The government did not charge Richards with conspiracy, however, allowing him to argue that the Pelon brothers limited his involvement in their illicit business endeavors only to that of a money courier.

This testimony places his knowledge squarely in issue and raises essentially the same circumstances as *United States v. Moore*. In that case, officers arrested the defendant after he tossed a bag of drugs out his car window. 531 F.3d 496, 500 (7th Cir. 2008). At trial, he argued that "the driver of the stolen vehicle, in which he was a passenger, gave Mr. Moore the bag and told him to toss it, without telling him what was in it." *Id.* That defense, *Moore* concluded, put knowledge directly at issue. *Id.* Richards raises nearly the identical defense here—that someone gave him a bag filled with drugs but he thought it contained something else. Thus, Richards, like the *Moore* defendant, put knowledge squarely at issue and opened the door to any prior bad acts evidence relevant to knowledge. *See Hicks*, 635 F.3d at 1069-70.

### b.   The California Calls Are Relevant to Richards's Knowledge of Drug Trafficking at the Pelon Ranch

Relevant evidence has a tendency to make a fact of consequence more or less probable. Fed. R. Evid. 401; *see also United States v. Gomez*, No. 12-1104, 2013 WL 1352540, at *6 (7th Cir. Apr. 5, 2013). Thus, admission of the California tapes requires a "persuasive and specific" reason why the tapes make it more or less probable that Richards knew the bag contained cocaine rather than money. *See Miller*, 673 F.3d at 699. A specific and persuasive reason exists here: Beltran's Pelon alias links him to the ranch so tapes of Richards discussing drugs

with Beltran suggest Richards knew of drug trafficking that originated from the ranch.

Richards disagrees, suggesting that *Miller* controls because, as in *Miller*, the prior bad acts evidence proves knowledge only to the extent that knowledge collapsed into propensity. *See id*. at 697-99. That would be true and Richards would be right if the California calls captured some generic conversation about drugs *wholly* unconnected to the drug operation that brought Richards to Bolingbrook. But the content of the California calls—Richards speaking about cocaine with a man known as "Pelon"—does relate to the Boling-brook operation: Richards took his marching orders from a group of individuals who, like all others present at the ranch, shared that pseudonym.[8] That common monicker links Beltran to the ranch and directly undercuts Richards's testimony that he had no specific knowledge of drug dealing there because "they never told me that." From Richards's drug conversations with Beltran, the jury could infer Richards's awareness of the Pelon brothers' involvement in the drug trade through a known drug supplier's (Beltran) use of an alias linked both to the ranch and to the individuals that sent Richards to Chicago. And if Richards knew of

---

[8] We note also the possibility that Richards knew Beltran only by his Pelon pseudonym. Richards testified he did not know anyone named Juan Beltran and stated that he never spoke with anyone by that name. Thus, a jury could infer that, like his association with the Latino Pelon brothers, Richards knew Beltran only as Pelon.

the Pelon brothers' involvement with drug trafficking, it would "tend to make the existence of any fact that is of consequence to the determination of the action"—such as Richards's knowledge that the bag contained cocaine rather than money—"more probable[.]" *Hicks*, 635 F.3d at 1069-70 (quoting Fed. R. Evid. 401); *see also Gomez*, 2013 WL 1352540, at *3 ("[T]he Rule 404(b) evidence must respond to what is said to trigger admissibility.").

Richards, however, ignores this connection and argues Beltran was completely uninvolved in the Chicago transaction. Maybe so. The conversation suggests that Beltran had no idea Richards had plans to travel to Chicago. But the fact remains that Beltran went by an alias associated with those who sent Richards to Bolingbrook. From that, a jury could infer that Richards knew more about drug trafficking by the Pelon brothers than he testified to. At bottom, a prior bad act's relevance in proving knowledge does not require the exact same cast of characters nor does it require a definitive link between the prior bad act and the current one. Thus, Beltran need not be directly involved in the Bolingbrook transaction to make the California calls relevant to Richards's knowledge. In *Moore*, the defendant's prior bad act of throwing a bag of cocaine from a car window proved relevant to his knowledge of another bag's contents. 531 F.3d at 500. This was so despite no connection between the prior incident and the conduct under prosecution—nothing suggested the *Moore* defendant had received both bags from the same individual or that one transaction related to the other. *Id.* at 498-500.

Nevertheless, we do not suggest, as the government did at trial, that *wholly* unrelated prior bad acts may show knowledge. The government could not therefore introduce conversations depicting completely unrelated drug activity under the rationale that the defendant's general familiarity with the drug trade proves relevant to his knowledge. The admissibility of these phone calls thus turns on Beltran's Pelon alias: It connected Beltran to the Pelon brothers via the Pelon ranch even if Beltran himself did not direct the Bolingbrook operation. Without it, the California calls would prove relevant to knowledge only through the propensity inference— precisely the result forbidden by *Miller*. In short, Richards told the jury that he thought the bag contained money and that he had no knowledge of drug trafficking originating at the Pelon ranch. Beltran's alias linked him to the ranch so any conversations between Richards and Beltran suggesting knowledge of the drug trade permit the jury to infer that Richards had greater knowledge of drug trafficking at the ranch than he let on. This connection makes the California calls relevant to Richards's knowledge of the bag's contents.

### 2. The California Calls Are Similar Enough and Close Enough in Time to be Relevant

Prior bad acts too dissimilar from the charged conduct or too remote in time can render evidence inadmissible under Rule 404(b). *See Hicks*, 635 F.3d at 1070; *United States v. Conner*, 583 F.3d 1011, 1023 (7th Cir. 2009). According to Richards, the calls are too dissimilar from the Bolingbrook operation because the calls discussed at

most a few ounces of cocaine, whereas the charges in-
volved transportation of ten kilograms of the drug. Rich-
ards, however, ignores the key similarity: in this case,
Richards took his marching orders from the Pelon
brothers and in the phone calls he discussed drugs with
a man known as Pelon. This similarity—not the amount
of drugs—provides the central link between the
California calls and the charged conduct. It makes the
calls relevant to Richards's knowledge of drug trafficking
at the Pelon ranch and the contents of the gym bag.
Although nothing suggested the phone calls involved the
exact same characters running the Pinecrest operation, *see
Conner*, 583 F.3d at 1023 (prior bad acts admissible when it
involved "same characters and similar activities"); *United
States v. Wilson*, 31 F.3d 510, 515 (7th Cir. 1994) (prior bad
acts admissible when it involved the "same parties at the
same location"); *see also Baker*, 655 F.3d at 682 (prior
conviction substantially similar when it involved same
activity but different people), neither were the California
calls totally unrelated (or, at least, so a jury could con-
clude). Thus, the California calls are unlike the prior
drug convictions in *Hicks*, which had no relationship to
the drug deal resulting in the prosecution. 635 F.3d at
1070. As *Hicks* explained, nothing suggested the "prior
convictions for cocaine possession and distribution
make it more likely that [Hicks] was a 'knowing partici-
pant' in *this* drug deal[.]" *Id.* In contrast, the Pelon alias
of both Beltran and Richards's handlers provides the
nexus between the two crimes that was absent in *Hicks*.
We thus conclude that the conduct described in the
California calls is sufficiently similar and close enough
in time to the Bolingbrook operation.

### 3. The Potential for Unfair Prejudice Did Not Substantially Outweigh the Probative Value of the Calls

Rule 403 balancing applies with full force when considering the admission of prior bad acts evidence. *Miller*, 673 F.3d at 696. As an initial matter, nearly all government evidence prejudices the defendant—if it did not, the government would not introduce it. The inquiry turns on whether the evidence prejudices the defendant in some unfair way that substantially outweighs the value of the evidence in determining the truth. *See United States v. Perkins*, 548 F.3d 510, 515 (7th Cir. 2008). "Evidence is unfairly prejudicial only to the extent that it will cause the jury to decide the case on improper grounds." *United States v. Chavis*, 429 F.3d 662, 668 (7th Cir. 2005). In cases involving Rule 404(b) evidence, that improper ground is the propensity inference.

We have previously recognized, though, that properly administered limiting jury instructions cure the danger of unfair prejudice unless "the jury could not follow the court's limiting instruction." *Perkins*, 548 F.3d at 515 (quoting *United States v. James*, 487 F.3d 518, 525 (7th Cir. 2007)); *see, e.g., Baker*, 655 F.3d at 682; *United States v. Denberg*, 212 F.3d 987, 994 (7th Cir. 2000). The district court here instructed the jury on several occasions to consider the calls only in relation to Richards's knowledge of the bag's contents. Richards ultimately makes no showing that the district court's instructions did not resonate with the jury or were misunderstood. Moreover, the district court engaged in a careful voir dire of Agent

Riley and reviewed transcripts of the calls before ruling on their admissibility. *See United States v. Beasley*, 809 F.2d 1273, 1279 (7th Cir. 1987) (criticizing "perfunctory" pretrial hearing on Rule 404(b) evidence). To further mitigate the potential for prejudice, the calls themselves do not directly reference drug activity and the jury, if it chose, could have disbelieved the testimony of Agent Riley. Defense counsel also had ample opportunity to— and actually did—vigorously cross-examine Agent Riley.

Admittedly, the California calls are not as probative of Richards's knowledge as other evidence could have been—such as evidence that Richards discussed drugs with the Pelon who sent him to Chicago or evidence more closely linking Beltran with those brothers. But the calls were not wholly irrelevant—as we have explained, their content supported an inference that, contrary to his testimony, Richards knew of drug activity at the Pelon ranch. And though not as probative of Richards's knowledge as other evidence would have been, neither were the calls as prejudicial as other types of Rule 404(b) evidence, such as an actual conviction for drug trafficking, which would definitively establish Richards's involvement in the drug trade (and would be particularly tough to attack on cross-examination). Evidence of such convictions involves a far greater risk that the jury will "decide the case on improper grounds," such as the propensity inference, than on the evidence related to the conduct charged. Yet we have previously declined to find unfair prejudice in evidence as prejudicial as a prior conviction when coupled with a limiting instruction. *E.g.*, *Moore*, 531 F.3d at 500.

Ultimately, the district court took the proper prophylactic steps to insure the jury drew no improper inference from the California calls. Mountains of authority confirm that, when introduced for a valid non-propensity purpose, such limiting instructions and voir dire examinations cure any unfair prejudice that results from introduction of prior bad acts evidence. *Baker*, 655 F.3d at 682; *Perkins*, 548 F.3d at 515 (quoting *James*, 487 F.3d at 525); *Denberg*, 212 F.3d at 994. Because no such unfair prejudice arose from admission of the California calls, and because those calls prove relevant to Richards's knowledge of the bag's contents after he disavowed knowing that drug trafficking originated at the Pelon ranch, we affirm the district court's admission of the California calls under Rule 404(b).

## C. Although Admissible, the Government Improperly Used the California Calls to Argue Propensity During Closing

Admission of Rule 404(b) evidence, however, does not grant the government free rein to use that evidence however it wishes. Having obtained admission of the evidence for a specific, non-propensity purpose, the government cannot then deploy the Rule 404(b) evidence in support of some other argument or inference. Rather, it must limit its use of the evidence to the purpose proffered when admitting the evidence. *See Gomez*, 2013 WL 1352540, at *3 ("[T]he Rule 404(b) evidence must respond to what is said to trigger admissibility."). It cannot ever rely upon that evidence to argue propen-

sity. The government did so in this case so we vacate the conviction and remand for retrial.

Improper prosecutorial comments during closing arguments are reviewed under a prosecutorial misconduct framework. *See, e.g.*, *United States v. Bell*, 624 F.3d 803, 811 (7th Cir. 2010). This analysis requires, first a determination that prosecutors acted improperly, and second a conclusion that the improper conduct prejudiced the defendant. *E.g.*, *United States v. Simpson*, 479 F.3d 492, 503 (7th Cir. 2007), *abrogated on other grounds by United States v. Boone*, 628 F.3d 927, 933 (7th Cir. 2010). Because Richards objected to the government's closing, we review the district court's decision to permit the government's argument for abuse of discretion. *Id.*

### 1. The Government's Closing Argument Invited the Jury to Draw the Prohibited Propensity Inference from the California Calls

"Just as introducing evidence to show propensity is improper, so too is arguing to a jury that it should convict a defendant based on the defendant's propensity to commit a crime." *Simpson*, 479 F.3d at 503; *accord United States v. Klebig*, 600 F.3d 700, 719 (7th Cir. 2010). This prohibition remains even when the court has admitted the Rule 404(b) evidence for some permissible non-propensity purpose—the government cannot later argue that the evidence shows the defendant's propensity to engage in criminal behavior. Yet that is precisely the inference the government invited in this case. Indeed, during closing arguments, prosecutors

routinely called the defendant a "drug dealer" and a "drug trafficker." As support for these labels, the government relied exclusively on the California calls: "You heard the calls. . . . When he doesn't think anyone is listening, he is a cocaine dealer."[9] *Jones*, in fact, found a propensity inference in nearly the same conduct—repeated prosecutorial characterizations of the defendant as a drug dealer: "The Assistant U.S. Attorney then repeatedly told the jury that Jones's prior convictions showed that he was a drug dealer, and that they should therefore, find that he intended to deal drugs in this case. This looks, walks, and sounds like the argument 'once a drug dealer, always a drug dealer.'" *Jones*, 389 F.3d at 757; *see also Simpson*, 479 F.3d at 503-04 (impermissible propensity argument in defendant's statement that he had participated in so many drug deals he could not remember the specific deal with which he was charged). No material differences separate *Jones* from this case.

The government's oft-repeated refrain naming the defendant a "drug dealer" and "drug trafficker" is not even the most glaring example of its propensity argument. On rebuttal, the prosecutor told the jury, "Clearly the defendant's drug dealing is not limited to California.

---

[9] The government relied on the California calls to prove Richards's status as a drug dealer at other times, too. "[T]he defendant knew this cocaine was terrible quality based on the packaging and just by looking at it," the prosecutor told the jury. "How does he know that?" she continued. "Because he is a drug trafficker."

It happens here too." The prosecutor has all but linked these two sentences with "because." No matter that he did not—the meaning is the same: Richards dealt drugs in California so he must have done so here, too. And later on, the prosecutor told the jury "These layers of concealment are used to give drug dealers plausible deniability. But that doesn't work for the defendant because we already know he is a cocaine dealer." How, precisely, does the government *already* know Richards is a cocaine dealer? From the California calls, of course. Again, the inference is the same. Richards dealt in California so he must have dealt in Bolingbrook.

The government instead insists that the district court properly admitted the evidence and, as a result, it was free to "weave the statement into its theory of the case." *Bell*, 624 F.3d at 812; *see also United States v. Bowman*, 353 F.3d 546, 551 (7th Cir. 2003). Fair enough, but Rule 404(b) prohibits the government's theory of the case from resting on the propensity inference. Here, the government did precisely that, placing the propensity inference at the center of its closing argument. Prosecutors never explained to the jury specifically *how* Richards's conversations with a man known as Pelon showed his knowledge of drug dealing at the Pelon ranch. For example, the government could have explained that Richards's drug conversations with a man known as Pelon suggested Richards knew of drug trafficking originating from the Pelon ranch, thereby showing Richards knew the bags contained drugs. It did not. Instead, the government simply used the California calls to label Richards a cocaine trafficker and

rested its case there. That is the propensity inference that *Miller*, *Jones*, and *Simpson* prohibit. *See Miller*, 673 F.3d at 699 ("[T]he government must affirmatively show why a particular prior conviction tends to show the more forward-looking fact of purpose, design, or volition to commit the new crime." (quoting *Jones*, 389 F.3d at 757-58)). Neither *Bowman* nor *Bell* suggests otherwise. Both cases found the challenged statements devoid of "propensity aspects" or submitted for a non-propensity purpose, such as challenging the defendant's credibility after he had testified. *Bell*, 624 F.3d at 811-12; *Bowman*, 353 F.3d at 551 (noting prosecutor never "asked the jury to draw the inference that because Bowman had admitted problems abiding by the law, he must be guilty").

Reduced to its core, the government's closing argument revolved around the propensity inference with the California calls as its centerpiece. The government paid scant attention to the knowledge rationale that justified admitting the tapes and instead deployed the tapes as evidence of Richards's propensity for drug trafficking. That argument was improper, and we conclude that the district court abused its discretion in concluding otherwise.

### 2. The Government's Propensity Arguments at Closing Prejudiced Richards and Entitle Him to a New Trial

Prejudice does not require an ironclad guarantee that, absent the prosecutorial misconduct, the outcome

of trial would have differed. *See Simpson*, 479 F.3d at 505 ("[I]t is not enough to say that the outcome probably would have been the same without the prosecutor's improper propensity inference and the evidence of [the defendant's] past unrelated drug deals."). "Doubts—a lack of 'fair assurance'—call for a new trial." *Miller*, 673 F.3d at 701.[10] Thus, Richards need not show that, on remand, a jury would not convict him a second time.

When gauging prejudice, we "consider the remarks in light of the entire record to determine if the defendant was deprived of a fair trial." *Simpson*, 479 F.3d at 504 (quoting *United States v. Wesley*, 422 F.3d 509, 515 (7th Cir. 2005)). Six factors influence this determination: (1) whether the prosecutor misstated evidence; (2) whether the statements implicate a specific right of the defendant; (3) whether the defense invited the prosecutor's remarks; (4) the trial court's instructions; (5) the weight of the evidence against the defendant; and (6) the defendant's opportunity to rebut. *Id.*

At the outset, several factors clearly favor the absence of prejudice. The statements did not implicate a

---

[10] We note that the prejudice bar stands higher when the defendant does not object to prosecutorial misconduct. *Bowman*, 353 F.3d at 550. In that situation, prejudice requires that the "outcome of the proceedings would have been different absent" the misconduct. *Id.* Richards preserved his objections with the district court, though, so he need not satisfy this high bar.

specific right, and the district court did give a limiting instruction.[11] Even that limiting instruction did little to mitigate the prejudice arising from the government's propensity arguments. Limiting instructions mitigate prejudice associated with Rule 404(b) evidence when the government offers the evidence for some permissible purpose and actually argues that permissible purpose at closing. *E.g.*, *Moore*, 531 F.3d at 500. When the government explicitly argues propensity, however, the curative value of a limiting instruction diminishes dramatically.

Other factors, however, weigh in favor of prejudice. Although the prosecution did not misstate the evidence, it "invited the jury to make an improper inference from the evidence, an action with a similar effect." *Simpson*, 479 F.3d at 504. Also, Richards had no opportunity to address the statements because the government made most inflammatory statements during its rebuttal argument. *See United States v. McMath*, 559 F.3d 657, 668 (7th Cir. 2009). And neither did Richards invite the prosecutor's statements with anything presented in his defense. True, Richards put knowledge at issue. That defense, however, simply allows the government to introduce the calls and

---

[11] The instruction read, in pertinent part: "Let me make plain once again to the jurors that you are to consider for purposes of this trial whether the Government has proved beyond a reasonable doubt the event that is charged in the indictment that occurred on November 21st. You are not to consider for purposes of finding him guilty conduct at an earlier point of the type that [the prosecutor] is referring to."

explain to the jury how they show knowledge. It does not invite the government to argue propensity.

The weight of the evidence factor also favors prejudice. Explaining away ten kilograms of cocaine is difficult and certainly supports an inference that Richards knew of its presence. But the government offered no direct evidence of that fact. Neither Officer Mok nor the other officers tailing Richards testified to seeing him open the bag, and the garage door to the Pinecrest house had closed after Richards backed into it. But Richards mounted a vigorous defense and told the jury he thought the bag contained money. A Michigan state trooper even bolstered Richards's defense by testifying that on a previous occasion police had found large amounts of money in a bag in the trunk of Richards's car. In short, Richards's fate hung on his credibility with the jury. The government's improper propensity argument shattered this credibility in unsalvageable ways. *See Simpson*, 479 F.3d at 504 ("In a case where the circumstantial evidence against Simpson was close, the prosecution's explicit instruction to the jury to draw the inference that Simpson had conducted 'so many' crack cocaine deals that he could not remember the deal for which he stood trial was a powerful argument."); *see also Bell*, 624 F.3d at 813 (finding no prejudice in case that was not a "swearing contest").

Only one factor counsels strongly toward finding no prejudice. The others call into question the fairness of Richards's trial and raise doubts that the jury would have convicted him absent the government's

improper propensity argument at closing. As a result, we conclude Richards deserves a new trial.

## IV. Conclusion

The police possessed sufficient probable cause to justify stopping and searching the gray Lexus so we AFFIRM the district court's denial of Richards's motion to suppress. Likewise, we agree with the district court that Richards placed his knowledge squarely in issue when he took the stand in his own defense. We also find the California calls relevant to Richards's knowledge of drug dealing at the Pelon ranch and, therefore, relevant to Richards's knowledge of the bag's contents. We thus AFFIRM the district court's admission of the California calls under Rule 404(b). We cannot, however, characterize the government's statements in closing arguments as anything other than an invitation to the jury to infer Richards's guilt in this case from his previous conversations involving drug dealing. That the government may not do. This improper suggestion of propensity prejudiced Richards so we VACATE Richards's conviction and REMAND for a new trial.

WOOD, *Circuit Judge,* concurring in the judgment. Theodore Richards stands convicted of possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). On appeal, he has raised three principal issues: (1) whether the district court properly denied Richards's motion to suppress on the ground that there was probable cause to stop his car and arrest him; (2) whether the district court abused its discretion when it admitted evidence of Richards's telephone calls with a person in California, over an objection under Federal Rule of Evidence 404(b); and (3) whether the government improperly used that evidence during its closing argument. Like my colleagues, I find the first question close, but in the end I conclude that the district court's decision not to suppress the evidence that resulted from the stop of Richards's car was supportable, taking all the circumstances into account. And like my colleagues, I find that the prosecutor's closing argument violated the limits that the court had placed on the evidence of the California calls, by inviting the jurors to convict Richards solely on propensity grounds. Moreover, this violation was prejudicial to Richards. Thus, I join my colleagues in their judgment that Richards has demonstrated that he must have a new trial. Where I part company with them is on the second issue Richards has raised: the admissibility of the California calls under Rule 404(b). I write to explain my position because this issue may arise in a retrial.

As the majority notes, *ante* at 25 n.7, this is an odd case: normally it does not make any difference whether the defendant is holding actual drugs or the proceeds from

the sale of drugs. But here, it does, because Richards was charged only with possession of cocaine with intent to distribute it. There was no conspiracy count, nor was there a direct distribution count that would have permitted a conviction based on the money. In my opinion, this was a fatal misstep on the prosecution's part in this case. It allowed Richards to argue, without fear of incriminating himself (at least with respect to the charges in the present case), that he thought that the backpack was filled with money, not drugs; this was in keeping with the role that he had played in the Michigan transaction. Nothing in the California calls gave the slightest reason to think that Richards had drugs rather than money, or money rather than drugs. I thus find the California calls useless when it comes to the particular question of knowledge that we have in this case: did Richards know that the bag contained *drugs*?

My colleagues place great weight on the fact that Richards's conversations in California were with a person who went by the name "Pelon," and that he was sent to the Pinecrest residence by men from "the Ranch," where lots of people also went by that name. But "pelon" is just a Spanish word that means "Bald Guy," or "Baldy." I therefore cannot read anything into the fact that a number of people adopted the "pelon" moniker, any more than I would if people called themselves "Shorty" or "Red-head" or "Curly." The fact that several people use the same nickname, with nothing more, does not establish that those people work together in the same enterprise or are in any way connected to each other. And it certainly tells us nothing about anyone's role

within the enterprise (supplier; distributor; courier; lookout; money-handler) for any given transaction. Other than the common nickname, there is no evidence that the man with whom Richards discussed drug deals in the wiretapped calls, Beltran (a.k.a. Pelon), had any connection to the men from "the Ranch" who sent Richards to the Pinecrest house. *Ante* at 26-28. Traveling to Chicago was never mentioned during the phone calls between Richards and Beltran. *Id.* at 7. The majority recognizes that evidence of "completely unrelated drug activity" would not be admissible to show that Richards likely knew that drugs as opposed to currency were inside the bag. *Id.* at 29. And it essentially admits that Richards's phone calls with Beltran would be completely unrelated aside from the fact that "Beltran went by a common alias associated with those who sent Richards to Bolingbrook." *Id*.

Richards contested the fact—essential to the government's theory—that he knew that the backpack in the trunk of his car contained drugs. The California calls shed no light on that issue; they show only that Richards had discussed drugs with a man who goes by the same nickname as the people who sent him on the trip to the Pinecrest residence. These facts do not have a tendency to make it more or less probable that Richards knew that the particular bag had drugs, not money, and thus they fail the test of relevance imposed by Federal Rule of Evidence 401. I would find that this case is governed by *United States v. Miller,* 673 F.3d 688 (7th Cir. 2012): the contested evidence proved nothing but Richards's propensity to be involved in the drug

trade. It shed no light on the crucial question whether the backpack contained drugs or money.

For these reasons, I respectfully concur in the judgment.